## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KM-01325-SCT

*ROY A. TATE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/04/1999 |
| TRIAL JUDGE: | HON. BETTY W. SANDERS |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROSS R. BARNETT, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - MISDEMEANOR |
| DISPOSITION: | REVERSED AND REMANDED - 05/03/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/24/2001 |

### EN BANC.

### MILLS, JUSTICE, FOR THE COURT:

### INTRODUCTION

¶1. Roy A. Tate appeals his conviction for simple assault in the Sunflower County Circuit Court.

### STATEMENT OF THE CASE

¶2. Roy A. Tate, an 81-year-old resident of Huntsville, Alabama, owns twenty catfish ponds in Sunflower County, Mississippi. Tate visited Sunflower County on June 8, 1998, and learned that folks had been fishing in his ponds without permission. Tate and his friend Harry Trammel traveled to the ponds after Tate learned of the poachers. Tate found nearly 100 people fishing in his ponds. He was irritated. He worked his way down the pond levee and approached the various groups of fishers. He notified them that they were trespassing on his ponds and ordered them to return the fish that they had caught and leave. Everyone Tate approached complied with his orders until he reached Velton Townsend. Townsend was fishing with his fifteen-year-old son, Leon Wright, and Carl Petty, Wright's uncle. The subsequent events involving Tate and the Townsend party are the subject of this case.

¶3. It is undisputed that Tate confronted Townsend regarding his activity at the ponds. Tate brandished a .38 caliber pistol at some point in the confrontation, initiated physical contact with Townsend by placing his hand on him, and ordered him to return the fish he and his party had caught. The specifics of this encounter,

however, are disputed.

¶4. Townsend testified that he was fishing on these ponds because he had heard they were open to the general public due to an alleged foreclosure. Townsend saw Tate talking with other groups of fishers before Tate approached him. Townsend testified that Tate immediately began cursing at him and stated that the fish Townsend had caught belonged to Tate. Townsend testified that he was simply trying to figure out what was going on when Tate retrieved a firearm from his truck, shoved him against Townsend's vehicle, and choked him with one hand while he pointed the gun at his head. Townsend alleged that Tate used a racial slur towards him during this confrontation. He testified that he was not frightened when Tate pointed the firearm at him. Townsend's son, with Trammel's assistance, retrieved the fish from Townsend's truck and placed them back in the pond. Leon Wright's testimony regarding this confrontation substantiated that of his father.

¶5. Tate disputed Townsend's testimony. Tate alleged that he asked Townsend to return the fish and leave several times, and only after the Townsend party did not honor these requests did he reach into the cab of his truck and retrieve his weapon. He admitted placing his hand on Townsend, but he testified that he never choked him. Rather, he put his hand on Townsend's upper chest-never around his throat. He explained that he did this to put Townsend off balance so that Townsend could not grab the firearm from his hand. Townsend was younger and more powerful than him, and, as owner of the property, Tate was outnumbered at the time by poachers. Tate's experience in using firearms is well-documented. He is a 23-year veteran of the U.S. Army. He served in World War II and the Korean War, and has earned a Silver Star, a Purple Heart, and four Bronze Stars. Tate testified that his army training taught him to knock a larger opponent off balance when using a gun in close proximity to protect himself and to prevent his opponent from grabbing the gun. He testified that he did not use any racial slur against Townsend. Harry Trammel's testimony regarding this confrontation was substantially similar to Tate's. Tate and Trammel are white. Most of the poachers, though not all, were African American.

¶6. The State also offered proof in the trial court, without objection from Tate, that an additional altercation occurred with a Doris Stokes, another poacher found fishing at Tate's pond. Stokes testified that Tate assaulted her children, cursed her, grabbed her fishing pole, pointed his gun at her, and used a racial slur towards her. Tate denied most of these accusations but admitted pointing his firearm at her. He claims, however, that she swung her fishing pole at him, and he caught it in self-defense. Trammel testified that Stokes refused to leave when Tate asked her to do so. He further testified that Stokes cursed and threatened Tate and then swung her fishing pole at him. We are uncertain as to the relevancy of this testimony. These alleged actions may have consisted of separate bad acts and should have been, therefore, objectionable. On the other hand, they may have been relevant to portray the tensions prevalent at the levee and might be of some value to the defendant in arguing the extreme necessity of the actions taken.

¶7. Sunflower County Deputy Sheriff Harold Keys pulled Tate over approximately two to three hours after Tate left his catfish ponds. Keys testified that he had received a complaint that Tate had pulled a gun on some people earlier that day. Chief Deputy Robert Thompson arrived at the scene shortly after Keys stopped Tate. Both Keys and Thompson discussed the situation with Tate on the side of the road, and both deputies testified that Tate used a racial slur towards Keys, who is black, and that he used a racial slur when referring to the individuals who had been fishing in his ponds. Tate admitted to the deputies that he pulled his gun on the people at his catfish ponds. He was arrested, and his gun was confiscated. Tate denied using any racial slurs in the presence of the deputies.

¶8. Tate's first trial for simple assault was in the Sunflower County Justice Court on July 14, 1998. He was fined $173.50. Tate appealed to the Sunflower County Circuit Court. The circuit court held a trial de novo on June 4, 1999. The jury found him guilty of simple assault under Miss. Code Ann. § 97-3-7(1)(c) (Supp. 1999). The trial court ordered Tate to pay a fine of $500. Tate now appeals to this Court, raising the following assignments of error:

## ISSUES

**I. Because the verdict was against the overwhelming weight of the evidence, Tate's motion for a directed verdict, as well as his motions for J.N.O.V. and a new trial, should have been granted.**

**II. The state-sponsored testimony and the questions and arguments of the prosecution improperly called attention to defendant's race, leading to a jury verdict that was the product of bias and prejudice.**

**III. The trial judge abused her discretion in failing to rebuke the prosecution for its appeals to the race issue.**

**IV. The trial judge abused her discretion in failing to sustain defense objections to the irrelevant testimony of Deputy Keys.[(1)]**

## LEGAL ANALYSIS

### I. Was the verdict against the overwhelming weight of the evidence?

¶9. We have stated:

> In passing upon a motion for directed verdict, all evidence introduced by the state is accepted as true, together with any reasonable inferences that may be drawn from that evidence, and, if there is sufficient evidence to support a verdict of guilty, the motion for a directed verdict must be overruled.

*Hall v. State*, 644 So. 2d 1223, 1228 (Miss. 1994). Motions for J.N.O.V. are reviewed in the same manner. *Henson v. Roberts*, 679 So. 2d 1041, 1045 (Miss. 1996). A trial court's denial of a motion for a new trial will be reversed only when an abuse of discretion has occurred. *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999).

¶10. Miss. Code Ann. § 97-3-7(1)(c), the statute under which Tate was convicted, provides that:

> A person is guilty of simple assault if he . . . attempts by physical menace to put another in fear of imminent serious bodily harm; and, upon conviction, he shall be punished by a fine of not more than Five Hundred Dollars ($500.00) or by imprisonment in the county jail for not more than six (6) months, or both.

¶11. A landowner may use such force as is reasonably necessary to protect his property or evict trespassers from his property. *Higgenbotham v. State*, 237 Miss. 841, 846, 116 So. 2d 407, 409 (1959). The jury was instructed to find Tate not guilty of simple assault if it found that he used such force as was reasonably necessary to (1) prevent Townsend from removing the fish from his property; or (2) remove the trespassing Townsend from his property. The jury convicted Tate, and thus obviously found that he

used unreasonable force in regaining possession of his fish and evicting Townsend from his property.

¶12. Tate argues that the force he used during his confrontation with Townsend was reasonably necessary. He states that he is well-trained in the use of firearms as a result of his training and experience in the military. Thus, he asserts he used his gun in a careful and skillful manner. Tate notes that he neither fired the weapon nor struck Townsend with it. He further asserts that his actions were reasonable since he was outnumbered by poachers at the catfish ponds and was much older and weaker than Townsend.

¶13. Tate also testified that over the years he has been victimized by people fishing in his ponds without permission. Tate has never recovered any of his fish, and no one has ever been prosecuted for stealing his fish, notwithstanding the fact that he has reported these incidents several times to local law enforcement. Tate argues that he had no choice but to take the action he took if he wanted to avoid losing the fish Townsend and his party had caught.

¶14. The State agrees that the issue in the present case is whether or not Tate used reasonable force to recover his fish and evict the trespassing Townsend from his property. The State asserts, however, that this issue was for the jury to decide and argues that there is sufficient evidence in the record to support the jury's finding that Tate used more force than was reasonably necessary to protect his property.

¶15. It is undisputed that Tate placed his hand on Townsend and pointed a firearm at him. Tate and Townsend gave conflicting testimony regarding the exact circumstances of this confrontation; however, it was the jury's duty to weigh the credibility of each witness's testimony and decide whose testimony to believe. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993).

¶16. Whether the force used by an individual in defending himself was reasonable or unreasonable is a fact issue to be decided by the jury. *Hall v. State*, 644 So. 2d at 1229-30; *Griffin v. State*, 495 So. 2d 1352, 1354 (Miss. 1986). The question is whether this logic applies in defense of property.

¶17. This Court has previously stated that the "exhibition [of a firearm] . . . accompanied by an expression of vexed discontent was sufficient to support a charge of simple assault." *Edgar v. State*, 202 Miss. 505, 508, 32 So. 2d 441, 442 (1947). We have also held that the mere pointing of a firearm at an individual is sufficient to support a conviction for simple assault. *Gibson v. State*, 660 So. 2d 1268 (Miss. 1995); *Brown v. State*, 633 So. 2d 1042 (Miss. 1994); *Woodall v. State*, 234 Miss. 759, 107 So. 2d 598 (1958). These cases did not involve the protection of property but are, nonetheless, applicable to the case sub judice. In *Anderson v. Jenkins*, 220 Miss. 145, 70 So. 2d 535 (1954), we dealt specifically with the issue of what force is reasonable in the protection of property. We stated that "[t]he use of a deadly weapon in the protection of property is generally held, except in extreme cases, to be the use of more than justifiable force, and to render the owner of the property liable, both civilly and criminally for the assault." *Id.* at 151, 70 So.2d at 537 (quoting 4 Am.Jur., p. 163, Assault and Battery, par. 64). Whether these facts constituted an extreme case was a matter for the jury to decide.

¶18. Based on the evidence presented at trial, the jury determined that Tate used unreasonable force in protecting his property. This determination is consistent with prior decisions issued by this Court, and there is sufficient evidence in the record supporting the jury's verdict. In addition, the verdict is not contrary to the weight of the evidence. Therefore, the trial judge did not err in denying Tate's motion for JNOV or a new trial. Therefore, this assignment of error fails.

## II. Did the State improperly interject race into the trial?

¶19. In this assignment of error, Tate complains that the State impermissibly made race an issue in two ways. First, Tate complains that the State elicited testimony from witnesses regarding race. Second, Tate complains of the prosecutors' statements regarding race during opening statement and closing argument.

### Should witness testimony regarding race have been allowed?

¶20. The first mention of race from the witness stand occurred during the following exchange between the district attorney and Townsend on direct examination:

Q: Did [Tate] say anything to you--Mr. Tate is a white man, is he not?

A: Yeah.

Q: You're a black man, are you not?

A: That's right.

Q: This lady has to write all of this down. Did he say anything to you of a racial nature?

A: That's right.

Q: What did he say?

A: Well, could I use the word what he said?

Q: I want you to, yes.

A: He said, God d*** n******. Put my d*** fishes back. . .

¶21. The second instance of which Tate now complains occurred on direct examination when the district attorney asked deputy Keys if Tate made any racial remarks while he was pulled over on the side of the road. Tate objected on the grounds that such testimony was irrelevant and was merely an attempt to inflame the jury. In response, the district attorney stated that the testimony would go to Tate's state of mind. The objection was overruled, and Keys, who is black, testified that Tate called him a "boy." Keys also testified that Tate admitted that "[he] had pulled a gun on them and cocked it on them black bastards."

¶22. The third mention of race from the witness stand took place when the district attorney asked chief deputy Thompson if he, while Tate was pulled over on the side of the road, had advised Tate that he was under arrest. Thompson responded by saying "[y]es, sir. When I placed Mr. Tate under arrest, I seen I couldn't get anywhere with him, and he told me he was going to kill them black--then he went to cussing." Tate objected to this response as being irrelevant, but the trial court overruled the objection.

¶23. Finally, the last mention of race from the witness stand came during the following exchange between Tate's friend, Harry Trammel, and the district attorney on cross-examination:

Q: By the way, were all of these people black or were they black and white? What was the racial makeup of the group out there?

A: Well, most of them were black. There was a carload of white people that drove off as we drove up.

. . . .

Q: Are you also telling us that at no point did [Tate] use racial epitaphs [sic] or any stronger words, obscenities or profanities than hell or damn?

A: That's right.

¶24. It should be noted that although Tate objected to the race-related testimony of deputies Keys and Thompson, he failed to object to the race-related testimony of Townsend and Trammel. Explaining why he did not object to the testimony of Townsend and Trammel, Tate asserts that he did not wish to bring any additional attention to the race issue by objecting to these comments. He was well aware that not only the judge but most of the State's witnesses were black. In fact, the jury was predominantly black. He asserts that juries give great weight to the testimony of law enforcement personnel; therefore, he felt he had no choice but to object when the deputies offered testimony regarding alleged racial slurs.

¶25. As a general rule, in order to preserve an issue for review on appeal, a contemporaneous objection must be made at trial. *Gatlin v. State*, 724 So. 2d 359 (Miss. 1998). However, in order to prevent a miscarriage of justice, this Court retains the inherent power to notice error notwithstanding trial counsel's failure to preserve the error. *Johnson v. Fargo*, 604 So. 2d 306 (Miss. 1992).

¶26. Under Miss. Code Ann. § 97-3-7(1)(c), Tate was convicted of "attempt[ing] by physical menace to put [Townsend] in fear of imminent serious bodily harm." Tate asserts that intent is not an element of the crime, and that any testimony concerning his state of mind at the time of the assault is irrelevant. This Court has previously stated that the crime of attempt consists of three elements, the first of which is an intent to commit a particular crime. *Morris v. State*, 748 So. 2d 143, 146 (Miss. 1999) (citing *Harris v. State*, 642 So. 2d 1325, 1327 (Miss. 1994)). Thus, intent is relevant in this case. However, we do agree that the State pursued a line of questioning which wrongfully highlighted race in this case. While intent is an element of attempt, race is not. We find that the trial judge erroneously overruled Tate's objections to Keys' testimony.

¶27. Keys testified that Tate admitted that he pulled his gun on the poachers. Keys also testified that Tate allegedly used a racial slur towards him and a racial slur when referring to the poachers. Tate's racial views in general, or toward this particular complaining witness, are not an issue. *See Beckwith v. State*, 707 So. 2d 547, 578-583, 585-586 (Miss. 1998). In *Beckwith*, race was *the only explanation* for Beckwith's murdering Medgar Evers. *Id* at 579. Stated another way, the only reason Beckwith murdered Evers was because Evers was black. It was strictly a racially motivated crime. Thus, we held that it was not an abuse of the trial court's discretion to admit documents and testimony illustrating Beckwith's racist views. *Id.* at 579-580. Conversely, Tate's motivation emanated from people who were trespassing onto his land and stealing his fish, irrespective of the race of the individual poachers. Tate was on trial for simple assault, not for racial discrimination. Thus, the statements Tate made to Keys were irrelevant.

¶28. Assuming arguendo that the alleged racial slurs made by Tate were relevant, Miss. R. Evid. 403 provides for the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 requires a balancing test. The more probative the evidence is, the less likely it is

that a [403](#) factor will be of sufficient consequence to substantially outweigh the probative value. *[Mississippi Power & Light Co. v. Lumpkin](#)*, 725 So. 2d 721, 732, 733 (Miss. 1998) (citing **Foster v. State**, 508 So. 2d 1111, 1117 (Miss. 1987)). It is insufficient for one or more of the [403](#) factors to slightly outweigh the probative value. "The [403](#) factors must, in the language of the rule, 'substantially outweigh' probative value before the evidence may be excluded." ***Id.***

¶29. The probative value, if any, of Tate's alleged racial slurs made to deputy Keys was clearly 'substantially outweighed' by the danger of unfair prejudice. The State's line of questioning appears not only to have created the danger of unfair prejudice, but to have been calculated to have exactly that effect. This is especially true when considered in conjunction with the State's opening and closing statements. While one or two of these alleged racial statements may have been relevant, the State's repeated reference to and focus on alleged racist statements undoubtedly prejudiced Tate's right to a fair trial. The requisite element of simple assault is mens rea, not men's race. The trial judge allowed this improper and highly prejudicial line of questioning over Tate's objection. In so doing, she abused her discretion. *See, e.g.*, **Clark v. State**, 102 Miss. 768, 59 So. 887 (1912).

### Was it proper for the prosecutors to discuss race

### in their opening and closing arguments?

¶30. The district attorney accused Tate during his opening statement of uttering racial slurs when he confronted the fishers at his ponds. The district attorney listed for the jury what he saw as "the real issue" in the case and what he thought the evidence would show. That list included accusing Tate of "us[ing] racial epitaphs [sic]." This first mention of race in the state's opening statement would later become an apparent foreshadowing of the theme that would underlie the State's case.

¶31. The State closed its case with a two-part closing argument. An assistant district attorney told the jury, *inter alia*:

> And what did Mr. Velton [Townsend] say, he said, I told him [Tate] I was sorry. He said, I kept saying, man, if these is your fish, I'm sorry. I will put them back. I'm sorry. And what does he [Tate] say, you God d*** n*****. Y'all are going to put my fish back. . . ."

Later in her closing argument, the assistant district attorney stated "[t]hen when [Tate] gets to the deputy, Deputy Harold Keys, calls him a boy. I ain't got nothing else to say to you, boy."

¶32. The district attorney concluded the State's closing argument by telling the jury:

> There's also an issue here that we've got to confront head-on and to try to avoid it begs the issue, and it's race. There's no question about it. That plays a part in here. And you know and I know, and anybody who's lived in the South knows--and Alabama is in the South--anybody who's lived in the South knows that there is no worse derogatory statement that you can make to a black citizen than calling him a n*****. Second only to calling him a boy. Does that tell you what the attitude of Roy Tate was when he confronted these people out there?

¶33. Criminal convictions are not to be based upon race. "That no man shall be convicted upon an appeal to the race issue is a firm and settled proposition in this Court." **Gore v. State**, 155 Miss. 306, 124 So. 361 (1929).

> The race question and all of its vexations and perplexities should be dropped at the outer door of all courts of justice. . .under no circumstances should the court permit the officers of the state to say or do anything which might in the remotest degree prejudice the jury against the defendant on account of race or color or social standing.

*Clark*,102 Miss. at 768, 59 So. at 888. We have on numerous occasions reversed convictions in cases wherein prosecutors improperly used race as an issue. *Reed v. State*, 232 Miss. 432, 99 So. 2d 455 (1958); *Harris v. State*, 209 Miss. 141, 46 So. 2d 91 (1950); *Herrin v. State*, 201 Miss. 595, 29 So. 2d 452 (1947); *Funches v. State*, 125 Miss. 140, 87 So. 487 (1921); *Hardaway v. State*, 99 Miss. 223, 54 So. 833 (1911).

¶34. The sole question before the jury was whether the force used by Tate (who is white) against Townsend (who is black) was reasonably necessary in order for Tate to protect his property. Both defense witnesses were white, and all four State's witnesses were black. The only likely effect the issue of race had in this case was to prejudice the jury against Tate. We find that the prosecutors' comments regarding race, made during opening and closing statements, were improper and prejudicial.

### III. Should the trial judge have rebuked the State for appealing to the issue of race?

¶35. Tate argues that the trial judge should have, sua sponte, admonished the prosecution in the presence of the jury for bringing up the issue of race. In support of this argument, Tate cites *Clark v. State*, 102 Miss. 768, 59 So. 887 (1912). In that case, the trial court refused proposed jury instructions propounded by a black defendant which essentially instructed the jury to try him in the same manner that a white defendant would be tried. This Court affirmed the trial court's refusal of the defendant's proposed jury instructions and added that the trial judge should sua sponte rebuke the prosecutor in the presence of the jury if the State offers a jury instruction directing the jury's attention to the defendant's race. *Id.* at 888. The State offered no such jury instruction in the case sub judice; therefore, we find this assignment of error is without merit.

### <u>CONCLUSION</u>

¶36. We reverse the judgment of the Sunflower County Circuit Court and remand this case for a new trial with specific instructions that, upon retrial, the issue of race not be unduly raised or elicited from witnesses.

¶37. **REVERSED AND REMANDED.**

**PITTMAN, C.J., SMITH, WALLER AND COBB, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., DIAZ AND EASLEY, JJ.**

**BANKS, PRESIDING JUSTICE, DISSENTING:**

¶38. While I agree that our trial and appellate courts should be ever mindful of the potential for racial considerations to prejudice outcomes, there are occasions where evidence which reflects racial considerations is relevant and probative to the extent that it survives analysis under Miss. R. Evid. 403. This is such a case. Accordingly, I dissent.

### I.

¶39. This case involves a defendant who used racial epithets while allegedly committing simple assault against a trespasser. The majority reasons that the defendant's use of racial epithets is irrelevant to a showing of an "attempt by physical menace to put one in fear of immediate bodily harm" and is also highly prejudicial, thus, the testimony highlighting race should be excluded. I disagree.

¶40. The majority correctly notes that intent is a necessary element of proving an "attempt." This Court has long held that "intent being a state of mind is rarely susceptible of direct proof, but ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them . . ." *Harris v. State*, 642 So. 2d 1325, 1327 (Miss. 1994) *quoting Thames v. State*, 221 Miss. 573, 577, 73 So. 2d 134 (1954).

¶41. At issue in the present case is the allegedly assaultive behavior of Tate, which requires a showing of intent. The testimony at trial, including the testimony regarding race, serves to establish whether or not Tate "attempt[ed] by physical menace to put [Townsend] in fear of imminent serious bodily harm." Miss. Code Ann. § 97-3-7(1)(c) (Rev. 2000). Thus, this evidence is admissible as long as its probative value outweighs its prejudicial effects.

¶42. As the majority notes it is undisputed that Tate confronted Townsend about fishing at Tate's catfish ponds.[(2)] Tate testified that he utilized his military expertise in his attempt to subdue Townsend because Townsend was younger and more powerful than he was. Townsend, on the other hand, testified that he had suffered a stroke in 1995 which left him with the ability to only use one hand and having to use a cane to walk. He also testified that Tate choked him while pointing the gun at his head.

¶43. In my opinion, the words spoken by Tate in connection with alleged assaultive behavior, including those showing a mind set concerning race, are relevant and admissible and do not serve to unnecessarily interject race into the trial. *See, e.g., **Whitten v. Cox**,* No. 1998-CA-01410-SCT, 2000 WL 1031777, 8-11 (Miss. 2000)(defendant's statement about "n****r judge" relevant to provide full understanding of all the facts, to corroborate claim of false imprisonment and relevant to the plaintiffs' contention that the defendant sought to convince them that they would have no potential remedies available to them to redress his actions that afternoon); ***Beckwith v. State***, 707 So.2d 547, 579 (Miss. 1997)(evidence of racist writings relevant to motive for killing Civil Rights Leader). Furthermore, evidence of the use of racial epithets is applicable to showing a defendant's state of mind. ***Duonnolo v. State***, 397 A.2d 126 (Del. 1978)(defendant's remark he was going to "kill him a n****r" was relevant to defendant's state of mind and properly admitted although it was inflammatory); ***State v. Cason***, 454 S.E.2d 888 (S.C. 1995)(even though defendant's statement that he killed a "f*****g n****r b***h" was offensive, it did not inextricably inject race into the trial and was used to show the defendants state of mind, not that race was a motive for the crime).

¶44. In ***Cason***, the South Carolina Supreme Court analyzed the testimony of the defendant's use of a racial epithet in describing the murder victim, not in the context of admissibility but rather in the context of jury voir dire to ameliorate any undue prejudice. *Id.* That Court reasoned that a specific voir dire question designed to reveal racial prejudices on the part of the juror is required only when a "special circumstance" exists. *Id.* at 889 (quoting ***Ham v. South Carolina***, 409 U.S. 524, 93 S. Ct. 848, 35 L.Ed.2d 46 (1973)). For a special circumstance to rise to constitutional proportions, something beyond a difference in the defendant's and victim's race is required. *Id.* (citing ***Turner v. Murray***, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986)(death penalty is a special circumstance); ***Ham v. South Carolina***, 409 U.S. 524, 93 S.Ct. 848,

35 L.Ed.2d 46 (1973)(special circumstance existed when defendant claimed police framed him because of his civil rights activities)). *Id.* The trial court in *Cason* determined that the facts did not elevate race as an issue because the only facts interjecting race into the case were the testimony of two witnesses' quoting the defendant's comment. *Id.* The Supreme Court reasoned that the defendant's racial epithet was not evidence that race was a motive for the crime, defense, or motivation to prosecute. *Id.* at 890. The Court found that prosecution used the defendant's words to show his state of mind and not to show that race was a motive for the crime, and therefore, not only was it admissible, but no special voir dire was required. *Id.*

¶45. Likewise, in the instant case, the racial epithets serve to show Tate's state of mind at the time of the assault and his intent to put Townsend in fear of imminent serious bodily harm while using these assaultive words. Jury instruction S-2 provided:

> . . .that intent is a state of mind existing at the time a person commits an offense. The mind of the accused may be read, however, from his conduct and circumstances surrounding him at the time.

This instruction directed the jurors to use all evidence, even the evidence regarding the epithets, to determine Tate's intent.

¶46. Townsend testified that during the course of the assault Tate called him a D**N N****R. Doris Stokes, who witnessed the transaction between Tate and Townsend, testified that she had been accosted by Tate a few minutes earlier and told by him that he would "blow my G*****n brains out N****r. Deputy Keys testified that after he stopped Tate, Tate stated in reference to the assault "I had pulled a gun on them and cocked it on them black b******s." Chief Deputy Thompson testified that when he placed Tate under arrest Tate stated that he was going to "kill them black ..." and started cursing.

¶47. The Mississippi Rules of Evidence provide that:

> "Relevant Evidence" means evidence having any tendency to make the existence of any fact that is consequence to the determination of the action more probable or less probable than it would be without the confidence.

Miss. R. Evid. 401. These rules also provide:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of cumulative evidence.

Miss. R. Evid. 403.

¶48. Here, the testimony concerning racial comments made by Tate are relevant to the occurrence of the simple assault and also corroborate the victims' version of the incident. All of the testimony simply presents corroborative evidence of the simple assault. Townsend testified that Tate called him a racial epithet, placed his hand against his chest, and pointed a gun at him. The fact that Tate called Townsend this unnecessary name in conjunction with pushing him and holding the gun against his chest served to place Townsend in "fear of imminent physical harm."

¶49. The majority errs, in my view, in separating the incident into segments, as if Townsend attempted to interject race into the assault. Tate interjected race into the equation by carrying out his actions in part by

using racial epithets. Evidence of these epithets is necessary in showing Tate's intent with respect to his action and to distinguish that action from an incident in which a landowner simply ejected a trespasser. Although the evidence can obviously be prejudicial, it is necessary to explain Tate's state of mind and intent during the incident. Thus, the probative value of this evidence was not "substantially outweighed" by its prejudicial effects as the majority determines.

¶50. Deputy Keys's testimony regarding Tate's comments is also relevant evidence as it references the earlier assault against Townsend. While the testimony that Tate referred to Deputy Keys as "boy," seems irrelevant, it pales in comparison to the admissible evidence reflecting Tate's attitude and disposition at the time of the incident. The comment, "black b******s" that Tate made to Deputy Keys and to Chief Deputy Thompson, was in reference to the victims at Tate's ponds and these comments are corroborative of the testimony given by the victim and of Tate's general state of mind and his intent to put Townsend in fear of physical harm.

¶51. The comments regarding racial epithets are integral to the charged conduct. Further, evidence of the use of the epithets goes to the dispute concerning the assaultive nature of Tate's behavior. Race is inextricably linked to the assault not because of the difference in the victim's and the defendant's race, but because Tate used them as part and parcel of his assault on Townsend.

¶52. I agree with the majority that Tate's general or specific views on race are not at issue here, however, the racial epithets used toward the victim and substantiated by the deputies show Tate's state of mind at the time of the incident. This evidence did not serve to convict Tate because of his race as the majority suggests, the evidence served to provide evidence of Tate's intent with respect to the actions that he took.

¶53. The trial court has wide discretion in determining the relevancy and admissibility of evidence. Its decision to admit or reject evidence will not be reversed on appeal absent an abuse of that discretion. *See Sturvidant v. State*, 745 So.2d 240, 243 (Miss. 1999); *Johnson v. State*, 655 So.2d 37, 42 (Miss.1995). The trial court is not be required to exclude relevant evidence merely because it is offensive or unpleasant. *Lanier v. State*, 533 So.2d 473, 484 (Miss. 1988)(holding that the mere fact that photographs depict an unpleasant or gruesome scene is no bar to their admission if they are relevant). There was no abuse of discretion here.

## II.

¶54. Moreover, for the most part the issue has not been properly preserved. Tate states that at trial he decided not to object to the testimony of Townsend and Stokes because he "did not wish to bring an additional attention to the race issue . . . because not only the judge, but most of the State's witnesses were black." This Court has held that party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal because it is procedurally barred. *Foster v. State*, 639 So.2d 1263, 1288-89 (Miss. 1994). This Court applies the plain error rule only when it affects a defendant's substantive/fundamental rights. *Grubb v. State*, 584 So.2d 786, 789 (Miss. 1991). The plain error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice. *Gray v. State*, 549 So.2d 1316, 1321 (Miss. 1989). Failure to make a contemporaneous objection waives this issue for appeal purposes. *Gatlin v. State*, 724 So.2d 359, 370 (Miss. 1998).

¶55. At trial, Tate had the option to object to the testimony of Townsend and chose not to do so. He now claims that he did not object because he did not want to highlight that aspect of the case in light of the fact

that the jury was majority black. Tate could, however, have made a motion in limine to the court before this evidence was ever presented to the jury. Even after the first mention of race was made, Tate could have asked for a hearing outside the presence of the jury. Because Tate chose not to contemporaneously object, file a motion in limine, and there was no manifest miscarriage of justice, he is procedurally barred from questioning the admission of Townsend's testimony here. The deputies' testimony is simply corroborative of testimony already admitted without objection.

### III.

¶56. For the foregoing reasons, I dissent. I would affirm the judgment of the trial court.

**McRAE, P.J., DIAZ AND EASLEY, JJ., JOIN THIS OPINION.**

1. This issue will be addressed in conjunction with Issue II.

2. Contrary to the majority's assertion otherwise, everyone did not readily comply with Tate's order to return the fish and leave. As the majority points out, Doris Stokes testified that Tate pointed a gun at her and used a racial slur towards her when telling her to leave his property. Tate admitted to pointing his firearm at Stokes when she refused to leave.