MYERS, P.J., for the Court.
 

 ¶ 1. Randall Pittman was convicted in the Circuit Court of Perry County of the murders of Charles Cochran and S.I.
 
 *558
 
 Cochran.
 
 [1]
 
 The trial court sentenced Pittman to serve two consecutive life sentences in the custody of the Mississippi Department of Corrections. Aggrieved by his convictions and sentences, Pittman appeals, asserting that the trial court erred in admitting a videotaped police interrogation and that he received constitutionally ineffective assistance of counsel at trial. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. Charles and S.I., his ninety-one-year-old mother, lived on opposite sides of a duplex in Perry County, Mississippi. Charles was sixty-seven years old and partially paralyzed from a stroke, and S.I. was believed to suffer from Alzheimer’s disease. Both employed various caretakers to assist them with day-to-day activities. In September 2006, Brandi Meadows and her boyfriend, Josh Root, served as Charles’s and S.I.’s caretakers.
 

 ¶ 3. On September 10, 2006, Meadows and Root decided to go out with a friend. Meadows went to Charles’s side of the duplex to inform him that she was going out. At that time, Charles and S.I. were watching television. Pittman, who had been doing some construction work for Charles, was also present on Charles’s side of the duplex. Meadows and Root arrived back at the Cochran residence between 8:30 and 9:00 that night, and they slept on 5.1.’s side of the house as they usually did. The next morning, Meadows found it unusual that Charles had not called for his breakfast by 7:30 a.m., as he usually called every morning at 7:00 a.m. Meadows told Root to go next door and check on Charles. When he did, Root found Charles’s and S.I.’s dead bodies. Charles had been beaten to death with a 2x4, and 5.1. had been beaten to death with a glass candle holder.
 

 ¶ 4. Pittman, the last known person to see Charles and S.I. alive, would later tell authorities that he left Charles’s home at approximately 7:30 p.m. on the night of the murders. During his first interview, Pittman claimed that he was wearing blue jeans, a blue shirt, and Wellington boots when he left the victims’ home. In a subsequent interview, Pittman stated that he had on blue jeans and boots, but no shirt when he left the victims’ home. In attempting to verify Pittman’s account of his whereabouts after leaving the Cochran residence, authorities obtained a surveillance video from Tator’s, a convenience store in New Augusta, Mississippi. The surveillance video showed Pittman entering the store at approximately 8:30 p.m. on the night of the murders. He was not wearing a shirt or shoes, and he had on oversized jeans that he was holding up with one hand. Pittman then purchased a Nascar “combo pack,” which contained a t-shirt, cap, and bolo tie. Two patrons, Jonathon Hartfield and Frieda Stuart, testified that they saw Pittman at Tator’s that night with no shirt, no shoes, and oversized jeans. Hartfield and Stuart also testified that Pittman had what appeared to be blood on his face, chest, arms, and jeans. Iyanter Norris, Tator’s cashier on duty, testified that Pittman was covered in blood, and that the blood on his chest looked “like somebody done rubbed down his chest [-] like fingerprints where somebody rubbed down his chest.” Norris testified that Pittman paid for his Nascar combo pack and other items with a $100 bill, and he also requested change for another $100 bill. Norris broke the bill, but he refused when Pittman asked him to break another $100 bill. Norris stated that he saw three more $100 bills in Pittman’s wallet.
 

 
 *559
 
 ¶ 5. Stacy Hill, a friend of Pittman’s, also testified at trial. Hill stated that the last time she saw Pittman was in September 2006 at a friend’s house. Pittman was wearing a blue Nascar shirt bearing the number “24.”
 
 [2]
 
 The two smoked several hundred dollars’ worth of crack cocaine, which Pittman paid for. Pittman had several $100 bills and a bottle of Lortab pills. Pittman was peeling the prescription label off of the bottle when Hill asked Pittman where he had gotten the pills. Pittman replied that he had killed two people and stolen their possessions,
 
 [3]
 
 but Hill did not believe him at the time.
 

 ¶ 6. Pittman was ultimately convicted of Charles’s and S.I.’s murders.
 

 DISCUSSION
 

 1. Motion for Mistrial
 

 ¶ 7. At trial, Pittman moved in li-mine to preclude the State from discussing his past criminal history or discussing other crimes he was suspected of being involved in. The trial court did not grant the motion in its entirety, but it did admonish the prosecution to abide by Mississippi Rule of Evidence 404 and to not introduce evidence of prior bad acts unless it was interrelated or necessary to tell the complete story of the crime.
 
 See Bell v. State,
 
 963 So.2d 1124, 1131(¶ 16) (Miss.2007).
 

 ¶ 8. The State subsequently sought to introduce a videotaped police interview of Pittman. The prosecutor stated:
 

 I understand and was told about the Court’s abomination [sic] about getting anything in these statements and so forth that had nothing to do with this case and would be prejudicial. So with the first video interview was on CDs, and it started getting into this other case. It has nothing to do with this case but toward the end they were talking about being a psych patient and having medication!,] and so what I had Jim Kelly to do was to take the VHS tape that we had made in order to be able to use that and start recording when they started giving the
 
 [Miranda
 
 warnings] in this case and ending that before he volunteered that he’s a psych patient, and I had already told him that. I just wanted to—
 

 The trial court then interrupted, asking defense counsel if this redaction would be sufficient:
 

 [The Court]: Is that correct, Mr. Johnson?
 

 [Defense Counsel]: Yes, sir.
 

 [The Court]: And you don’t have any problem with that?
 

 [Defense Counsel]: No problem.
 

 ¶ 9. The videotaped interview was then played for the jury. The following exchange occurred as the investigator interrogated Pittman concerning the $100 bills he allegedly took from one of the victims:
 

 [Pittman]: My mind’s screwed up cause [sic] they got me on this crap here[,] and it’s the second time I’ve been locked up on this bull crap I’m up here on now.
 

 [Investigator]: We didn’t have anything to do with that.
 

 [Pittman]: I understand that[,] and I believe that.
 

 
 *560
 
 [Investigator]: We didn’t. What we are here for is to try to solve this Cochran case. We haven’t asked you anything on this other case.
 

 ¶ 10. Defense counsel then moved for a mistrial, arguing that the State had wrongfully introduced prior bad acts evidence.
 
 [4]
 
 The trial court denied the motion, stating: “I didn’t even hear it. Now, I could give a cautionary instruction to the jury that they should disregard it, which is your call, but in my opinion it would simply highlight something they probably didn’t hear either.” Defense counsel declined the offer for a corrective instruction.
 

 ¶ 11. The decision to grant a mistrial lies within the sound discretion of the trial court.
 
 Dora v. State,
 
 986 So.2d 917, 921(¶ 8) (Miss.2008). The supreme court has stated:
 

 The trial court must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant’s case; however, the trial judge is permitted considerable discretion in determining whether a mistrial is warranted since the judge is best positioned for measuring the prejudicial effect.
 

 Sipp v. State,
 
 936 So.2d 326, 331(¶ 7) (Miss.2006) (citations omitted). “[A] mistrial is reserved for those instances where the trial court cannot take any action which would correct improper occurrences.... ”
 
 Easter v. State,
 
 878 So.2d 10, 21 (¶ 34) (Miss.2004).
 

 ¶ 12. First, as defense counsel specifically declined to object to the introduction of the videotape, this issue is procedurally barred.
 
 See Rollins v. State,
 
 970 So.2d 716, 721(¶ 12) (Miss.2007). Notwithstanding the procedural bar, we find that the trial court did not abuse its discretion in denying Pittman’s motion for a mistrial. Defense counsel declined a corrective instruction, and we find that the references to “this bull crap I’m up on here now” and “this other case” on the tape are sufficiently nondescript that any prejudice resulting from their admission is harmless in light of the other evidence of guilt. This issue is without merit.
 

 2. Racial Comments
 

 ¶ 13. Pittman argues that the State wrongfully failed to redact a certain portion of the interrogation videotape where Pittman used racial epithets. During the interview, Pittman was inconsistent about the number of $100 bills he possessed on the night of the murders. Pittman initially stated that he had one, but he later said that he had a second, which he had used to purchase crack cocaine for a prostitute. He stated that the reason he had initially lied was that he feared that the drug dealer would retaliate against his family. Specifically, Pittman stated, “I know how these G* * — d* * * *ed n* * * *rs is [sic]. They — I know — I’m living up here with them now. I listen to them every day.”
 

 ¶ 14. At trial, prior to the introduction of the tape and its exhibition to the jury, the prosecutor stated: “I don’t want to do anything to create an error in the case, but there are some racial comments on there and some other comments that just need to be in it, and there’s no way I can redact it, so I wanted to advise the Court of that.”
 

 ¶ 15. As Pittman’s defense counsel made no objection to the introduction of the videotape, this issue is procedurally barred.
 
 See Rollins,
 
 970 So.2d at
 
 *561
 
 721 (¶ 12). This Court, however, retains the inherent power to notice error notwithstanding trial counsel’s failure to preserve the error, if necessary to prevent a manifest miscarriage of justice.
 
 Johnson v. Fargo,
 
 604 So.2d 306, 312 (Miss.1992).
 

 ¶ 16. Pittman argues that this portion of the interview tape was irrelevant and prejudicial, and that we should notice plain error as the supreme court did in
 
 Tate v. State,
 
 784 So.2d 208 (Miss.2001). In
 
 Tate,
 
 the supreme court stated that “[t]he race question and all of its vexations and perplexities should be dropped at the outer door of all courts of justice ... under no circumstances should the court permit the officers of the [S]tate to say or do anything which might in the remotest degree prejudice the jury against the defendant on account of race or color or social standing.”
 
 Id.
 
 at 215(¶ 33) (quoting
 
 Clark v. State,
 
 102 Miss. 768, 772, 59 So. 887, 888 (1912)).
 

 ¶ 17. Pittman’s admissions concerning whether and when he possessed the $100 bills were unquestionably relevant. While we agree that the State could have redacted the racially derogatory remarks from the interview videotape, Pittman has failed to demonstrate that this was necessary to prevent a miscarriage of justice.
 
 See Johnson,
 
 604 So.2d at 312. In
 
 Tate,
 
 the prosecutor brought the issue of race to the forefront, repeatedly interjecting race into a trial concerning a white defendant and a black victim.
 
 See Tate,
 
 784 So.2d at 215(¶ 29) (‘‘While one or two of these alleged racial statements may have been relevant, the State’s repeated reference to and focus on alleged racist statements undoubtedly prejudiced Tate’s right to a fair trial.”). Here, Pittman acknowledges that race was not an issue in the ease, and the prosecutor made no reference to the racial comments before the jury. Likewise, any prejudice resulting from the jury’s distaste for the racial comments must be viewed in light of the severity of the offenses charged and with Pittman’s contemporaneous admissions that he had purchased crack cocaine with the money and used the cocaine to pay a prostitute. This issue is without merit.
 

 3. Ineffective Assistance of Counsel
 

 ¶ 18. Pittman argues that his counsel at trial was ineffective in failing to preserve for appeal the trial court’s denial of his motion for a continuance. He also asserts that his defense counsel was ineffective in failing to request a “jail-house snitch” jury instruction.
 

 ¶ 19. Mississippi Rule of Appellate Procedure 22(b) states:
 

 Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.
 

 ¶ 20. “In order to prevail on the issue of whether his defense counsel’s performance was ineffective, [the appellant] must prove that his counsel’s performance was deficient and that he was prejudiced by counsel’s mistakes.”
 
 Kinney v. State,
 
 737 So.2d 1038, 1041(¶8) (Miss.Ct.App.1999) (citing
 
 Strickland v. Washington,
 
 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). “There is a strong but rebuttable presumption that counsel’s conduct fell within the wide range of reasonable professional assistance.”
 
 Id.
 
 (citing
 
 Moody v. State,
 
 644 So.2d 451, 456 (Miss.1994)). Additionally, an appellant is required to “allege both prongs of the above test with specific detail.”
 
 Coleman
 
 
 *562
 

 v. State,
 
 979 So.2d 731, 735(¶ 15) (Miss.Ct.App.2008) (citing
 
 Brooks v. State,
 
 573 So .2d 1350, 1354 (Miss.1990)).
 

 ¶ 21. Prior to the trial, Pittman’s defense counsel moved for a continuance to locate a witness, Jamie Witter, that Pittman wished to call at trial. Witter had given a sworn statement to investigators stating that she had been with the Coch-rans’ caretakers, Meadows and Root, on the night of the murders. She stated that when she arrived at the Cochrans’ duplex around 9:45 p.m., Root was there, and he told her that he had checked on the Coch-rans some time before. She also stated that around midnight, Meadows went outside and returned, stating that she had checked on the Cochrans and found that they had fallen asleep watching television.
 

 ¶ 22. Pittman argued in his motion for a continuance that locating Witter was crucial to his defense because her statement contradicted those of Meadows and Root, who initially made similar statements to investigators, but subsequently recanted.
 
 [5]
 
 Pittman’s counsel admitted that he did not know where Witter was located, but he asked the trial court to provide him with the means to locate her. The trial court denied the motion, and Pittman’s counsel did not raise the issue again in his motion for a new trial.
 

 ¶ 23. The supreme court has held that “there are certain errors that must be brought to the attention of the trial judge in a motion for a new trial, so that the trial judge may have an opportunity to pass upon their validity before [an appellate court] is called upon to review them.”
 
 Jackson v. State,
 
 423 So.2d 129, 131 (Miss.1982) (quoting
 
 Colson v. Sims,
 
 220 So.2d 345, 346 n. 1 (Miss.1969)). One of these is a motion for continuance, the denial of which “is not reviewable unless the party whose motion for continuance was denied makes a motion for a new trial on this ground, making the necessary proof to substantiate the motion.”
 
 Id.
 
 at 132. The supreme court has also stated:
 

 If the court declines to grant the continuance [an attorney] should sue out the proper process for them, and when the case is called for trial should renew his application, make such changes in his affidavit as the conditions then existing require. If the continuance is still refused, he should with unremitting diligence seek to secure their attendance pending the trial by the continued use of the process of the court; if tried and convicted he should still persist in his efforts to enforce their attendance before the expiration of the term, and on his motion for a new trial present them to the court for examination; if, with all of his efforts, he is unable to have the witnesses personally present, he should, if practicable, secure their ex parte affidavits, which should be presented for the consideration of the court, which, on the motion for a new trial, will review the whole case and correct any error prejudicial to the defendant which may appear in any part of the proceeding.
 

 King v. State,
 
 251 Miss. 161, 171-72, 168 So.2d 637, 641 (1964) (citation and internal quotations omitted).
 

 ¶ 24. As it is not clear what subsequent developments, if any, Pittman’s counsel might have relied upon in a motion for new trial, the facts relating to this issue are not fully apparent from the record. We therefore decline to address the issue of ineffective assistance of counsel on direct appeal.
 

 ¶ 25. THE JUDGMENT OF THE CIRCUIT COURT OF PERRY COUNTY OF CONVICTION OF TWO
 
 *563
 
 COUNTS OF MURDER AND SENTENCE OF LIFE FOR EACH COUNT, WITH SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PERRY COUNTY.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR.
 

 [1]
 

 . S.I. was known by her initials, but her given name was Sarah Ida.
 

 [2]
 

 . Hill identified Exhibit 85, which was the shirt Pittman purchased at Tator's on the night of the murder, as the shirt Pittman was wearing when she last saw him.
 

 [3]
 

 . Charles had a prescription for Lortab and received ninety pills at the beginning of each month. Testimony also indicated that Charles had received $600, denominated in $100 bills, the day he was murdered.
 

 [4]
 

 . Pittman was apparently being held in Forrest County on an unrelated murder charge when the interview took place.
 

 [5]
 

 . At trial, they testified that they initially lied because they felt guilty about leaving the Cochrans alone that night and not checking on them until the next morning.