# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2012-KA-01825-COA

**CHARLES L. KUEBLER A/K/A CHARLES L. KUEBLUR A/K/A CHARLES KUEBLER A/K/A CHARLES LOUIE KUEBLER A/K/A CHARLES KEUBLER A/K/A CHARLES LOUIS KUEBLER**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/07/2011 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | EDWARD BLACKMON JR. |
| | DAVID PAUL VOISIN |
| | JANE E. TUCKER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| | MELANIE DOTSON THOMAS |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF DELIBERATE-DESIGN MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 09/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., BARNES AND FAIR, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.    A Hinds County jury convicted Charles "Louie" Kuebler of the deliberate-design murder of Tamra "Tammy" Stuckey. He was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). He now appeals, raising a number of

issues.

¶2. Finding only harmless error with the trial court's allowing evidence and its instruction regarding Kuebler's "flight," we affirm Kuebler's conviction and sentence.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. This case arises from the early morning shooting of twenty-eight-year-old Tamra in Jackson, Mississippi, on June 30, 2010. For three to four days prior to this date, Tamra had been staying with Kuebler at his apartment on Morningside Drive in Jackson. The status of Kuebler and Tamra's relationship was unclear, but testimony showed Tamra was romantically interested in Kuebler, but the sentiment was not reciprocated by him.

¶4. Kuebler kept a .380 caliber Smith and Wesson handgun at his apartment. Kuebler's friend, James "Nate" Robertson, who lived in the same apartment complex and "hung out" with Kuebler a couple of times a week, testified he saw the gun "all the time," in different places like the table and the couch. Two weeks prior to Tamra's death, while visiting Kuebler, Nate said he saw the gun fall out of the couch. Nate told Kuebler he ought to be careful with the gun, but Kuebler "put [the gun] up to his [own] head and pulled the trigger," stating, "I don't never keep it loaded." Nate recalled "that was the dumbest thing I [have] ever seen."

¶5. On the evening of June 29, 2010, at approximately 5:15 p.m., Kuebler, Tamra, Nate, and his friend Jennifer Olivier were "hanging out" at Kuebler's apartment. Nate and Jennifer left but returned at approximately 7:15 p.m. At around 8:00 p.m., they all went to Jennifer's apartment to watch television. At 10:30 p.m., the four individuals relocated to the pool area,

where they joined Aaron Aruck and Kristen Schumacher, whom they met for the first time. Aaron and Kristen lived in a nearby house with two other roommates. During their time at the pool, Kristen heard Kuebler verbally berating Tamra, who became upset. Kristen testified:

> [I]f Tammy would try to say anything, [Kuebler] would knock what she was saying down or tell her to shut up, or essentially keep her from saying anything or participating in the conversation. . . . There were times where [Tamra] would try and respond . . . [and] verbally defend herself[,] . . . but she got pretty broken down and didn't respond a whole lot after a while and got very quiet and very visibly upset.

Also, Jennifer testified that Kuebler was making offhand sarcastic comments while at the pool, and Kristen noticed he was being very aggressive vocally to Jennifer, and especially to Tamra. Additionally, Kuebler bragged about owning a gun.

¶6.     Around midnight, Nate and Jennifer returned to their apartment. Kristen testified that Kuebler continued talking to Aaron and her, but "anytime Tamra tried to say anything, [Kuebler] would silence her and call her stupid; tell her to get in the house." Because Tamra had to be at work at 5:00 a.m. in the morning, she eventually left the pool and retired to Kuebler's apartment shortly after midnight, leaving Kuebler, Aaron, and Kristen at the pool. After Tamra left the pool area, Kuebler started propositioning Kristen for sex, which made her feel very uncomfortable. At some point Aaron realized Kristen wanted to leave the pool area because of Kuebler's behavior; so they returned to their apartment.

¶7.     Around 12:15 a.m., Tamra walked to Jennifer's apartment to retrieve some clothes Jennifer had laundered for her. Approximately ten minutes later, Kuebler came to Jennifer's apartment to retrieve Tamra's purse.

3

¶8.    At 1:18 a.m., Tamra called Jennifer and Nate, crying.  She told them Kuebler was being "mean" and "ugly" to her.  Jennifer offered for her to come spend the night, but Tamra refused, stating she would have to "walk past" Kuebler if she left, and that would "make matters worse."  Jennifer offered to go over to Kuebler's apartment and bring Tamra to her apartment, but Nate said that would not be a good idea.  Nate told Tamra to just "go l[ie] down and go to sleep."  Tamra said she would.

¶9.    At 1:35 a.m., Tamra texted her long-time friend and roommate of six months, Kirby Edgar, a single message:  "Wake up . . I need [yo]u to save me."  Kirby lived in Canton, Mississippi.  Tamra had also called Kirby twice, minutes before the text, but Kirby was asleep and answered neither.

¶10.    Shortly after 2:00 a.m., Aaron realized he had left his cell phone in Kuebler's apartment when he had gone there to use the restroom earlier in the evening.  Aaron returned to Kuebler's apartment to retrieve his phone and found Kuebler rummaging around in his closet looking for something.  Tamra appeared to be asleep on the living-room couch.  Once Aaron got his phone, Kuebler "put his hand on [Aaron's] shoulder and sort of hurried [him] out of the [apartment]."  Aaron returned to his place and began smoking a cigarette on the front porch.  Approximately ten minutes later, Aaron heard Kuebler screaming "hysterically."  Aaron ran back to Kuebler's apartment to find Tamra lying on the couch, shot in the forehead.  When Aaron asked Kuebler what happened, Kuebler told him he and Tamra "were fooling around with each other and that she enjoyed him holding the gun to her head while they had sex."

¶11. Before Aaron arrived at Kuebler's apartment, apparently Kuebler ran to Jennifer and Nate's apartment, where he beat on their door and yelled, "Tammy got shot in the head. Call 911." Nate testified Kuebler was "acting pretty crazy . . . screaming and yelling"; so when Nate went into Kuebler's apartment, he looked for the gun. After walking outside to call 911, Nate returned and found Kuebler's gun on the floor by the coffee table. Nate observed that Tamra appeared to be deceased. Kuebler, covered in Tamra's blood, was attempting to give her CPR. Kuebler explained to Nate that the gun had fallen on the ground and gone off. Jennifer testified that when she arrived at the scene Kuebler was screaming and crying, saying, "Tammy, wake up." He told Jennifer, "[S]omething happened. My pistol fell on the floor."

¶12. Aaron returned to his place to tell Kristen that Tamra had been shot. Kristen called 911. At 2:41 p.m., the Jackson Police Department (JPD) received the call reporting the shooting. Officer Derrick Archey was the first responder on the scene, but other JPD officers arrived shortly thereafter, including Officers Keith Freeman, Sean Snow, Dewayne West, Carl Ellis, Mark Seals, and Crime Scene Investigator Eneke Smith. Tamra was pronounced dead at the scene. The officers found Tamra's body lying on the couch, with a gunshot wound to the head, with her feet "tucked" under the couch pillows.

¶13. The officers took statements from Kristen, Aaron, Nate, and Jennifer. However, when officers attempted to put Kuebler in the back seat of a patrol car in order to question him (as is the procedure and which was done to the other witnesses), Kuebler became belligerent. He shouted obscenities and racial slurs, as well as physically resisted the officers. He was

5

also telling the officers to "get [Tamra] some help," but the ambulance was already on the scene and medics had pronounced Tamra dead. When Kuebler refused to get into the patrol car, or put his hands behind his back after wrestling with the officers, they forced him to the ground and put handcuffs on him while he kicked and screamed. Once inside the patrol car, Kuebler proceeded to kick out one of the windows, resulting in the police placing him in leg shackles.

¶14. Investigator Smith recovered a Smith and Wesson .380 caliber handgun from the crime scene, along with two live rounds in the magazine, and one live round and shell casing from the floor. The gun and bullets were processed for fingerprints, but none were found. At the JPD station, Kuebler's hands were swabbed and the materials sent to the Mississippi Crime Lab (MCL) for a gunshot-residue test. Gunpowder was found on the back of Kuebler's right hand and left palm. Also, particles indicative of gunpowder were found on his right and left palms, and the back of his right and left hands. While JPD did not perform a gunshot-residue test on Tamra, Dr. Feng Li, the forensic pathologist, did. The test was sent to the MCL for processing; however, an analysis was not conducted on Tamra's kit because of the lab's policy not to perform analyses on victims "due to the fact that a victim of a gunshot wound" would always test positive. However, the State submitted Tamra's gunshot-residue kit to the MCL for analysis the first day of trial. On the third day of trial, the lab released the results of the test. Gunpowder was positively found on the back of Tamra's right hand and palm, and on the back of her left hand. Further, particles indicative of gunpowder were found on both of her hands.

¶15. In September 2010, Kuebler was indicted for deliberate-design murder under Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014), with the charge enhanced for using a firearm during the commission of a murder, in violation of Mississippi Code Annotated section 97-37-37 (Rev. 2014).

¶16. At trial, Kuebler's theory of the case was that Tamra either committed suicide or, while she was attempting suicide, Kuebler wrestled with her for the gun and it fell to the floor, accidentally discharging and striking Tamra in the forehead. Nineteen witnesses testified for the State; no witnesses took the stand in Kuebler's defense. Nate testified his view of Tamra's killing changed. The night of the crime he told police he thought Tamra's killing was an accident because he had seen Kuebler playing with the gun previously, but by the time of trial, "not so much."

¶17. Forensic scientist Starks Hathcock of the MCL performed the ballistics test on the handgun found at the crime scene. He testified that it was the weapon used to kill Tamra. Hathcock also performed a "drop test" with the gun due to Kuebler's accidental-discharge theory. He determined the gun could not discharge without someone's cocking the gun and pulling the trigger; it was impossible for the gun to discharge accidentally.

¶18. Dr. Li performed the autopsy on Tamra. He testified that her cause of death was homicide. Due to the gunpowder tattooing around her forehead wound, Dr. Li opined that she was shot at an intermediate range of two and one-half to three feet away. Further, Dr. Li also found Kuebler's theory "impossible" that Tamra's wound was caused by the gun's accidentally dropping to the ground and discharging, because of the trajectory of the bullet

7

through her brain.  Dr. Li testified that the bullet entered Tamra's forehead at the top of her head and was found at the base of her skull in a "lower position."  If Tamra had been shot by a bullet's coming from the floor, the angle would have been different.

¶19.    The trial court also allowed the State to introduce evidence of Kuebler's flight from custody in July 2011, approximately ten months after he was released on bond.[1]  Dennis Grant, an offender service coordinator from the probation company in charge of monitoring Kuebler through a home-monitoring device, testified at trial.  Grant explained that after Kuebler posted bond, he was placed on house arrest in October 2010, and was restricted from leaving Hinds County for any reason.  On July 13, 2011, Kuebler called and left Grant a message stating he had some documents from a dental appointment for him that he needed to deliver to the probation company's office, and he would call back.  However, Kuebler never contacted Grant again or delivered the documents.  The next day, Grant received notification from the monitoring center that the Hinds County Sheriff was in possession of Kuebler's ankle-bracelet monitoring device, which had been found on a highway outside of the Hinds County jurisdiction.  Grant then informed the court Kuebler had violated the conditions of his probation.[2]

¶20.    Also testifying as to Kuebler's flight was Louisiana Trooper John Dauzat, who was

---

[1]  The State's jury instruction on flight was also given.

[2]  Defense counsel said that Kuebler fled because of the belief he was going back to the Raymond Detention Center in Hinds County, where Kuebler claimed to have been beaten by certain Hinds County employees when he was first taken into custody.  Thus, defense counsel argued that if the State intended to introduce flight evidence as part of its case-in-chief, Kuebler had a right to show that he was not fleeing because of guilt but out of the fear of being beaten in jail.

8

on patrol in the early morning hours of July 17, 2011, near Alexandria, Louisiana. He initiated a traffic stop on Kuebler, who was speeding. Trooper Dauzat twice asked Kuebler to exit the vehicle, but instead of complying, Kuebler hollered, "what's the problem officer?" When Trooper Dauzat approached, Kuebler fled in his vehicle, initiating a high-speed chase. Other law enforcement units joined in the pursuit. Kuebler later abandoned his vehicle and fled on foot, before being apprehended by law enforcement. Kuebler then lied and told Trooper Dauzat his name was "Reggie Adams" from Jackson, Mississippi. Continuing his investigation, Trooper Dauzat determined "Reggie's" true identity approximately fourteen hours later.

¶21. The jury returned a verdict finding Kuebler guilty of deliberate-design murder, and the trial court sentenced him to life in prison. In December 2011, Kuebler filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. After a hearing, the trial court denied the motion in October 2012. Kuebler timely appealed.

¶22. Additional facts will be added as needed in the discussion of the issues Kuebler raises.

**ANALYSIS**

¶23. Kuebler argues that he was denied his fundamental right to present his theory of the case to the jury, which was that Tamra had been depressed and suicidal. The defense's theory was that the night of her death, she had taken numerous drugs and, in her depressed mental state, found his gun. While Tamra was threatening to shoot herself, the gun accidentally discharged, killing her. However, Kuebler claims the trial court improperly blocked admission of "crucial exculpatory evidence" throughout the trial, while the State was

9

allowed to "cherry-pick" evidence, which created the impression that Tamra feared Kuebler, which, among other errors, denied Kuebler a fair trial. We find no merit to these contentions. We do, however, find error in the introduction of evidence and jury instructions on flight.

### I.      Flight Evidence and Jury Instruction

¶24.    Kuebler claims he was denied a right to a fair trial when the trial court allowed the State to present evidence of flight, and denied him the right to introduce rebuttal evidence to explain the flight. Additionally, Instruction S-6 was given, which allowed the jury to presume guilt from the flight.

¶25.    Generally, evidence of flight "is admissible as evidence of consciousness of guilt." *Fuselier v. State*, 702 So. 2d 388, 390 (¶4) (Miss. 1997). However, the evidence "must be filtered through [Mississippi Rule of Evidence] 403."[3] *Shaw v. State*, 915 So. 2d 442, 447 (¶18) (Miss. 2005). As always, the admission of evidence is within the discretion of the trial judge, and reversal will be had only when an abuse of discretion results in prejudice. *Austin v. State*, 784 So. 2d 186, 194-95 (¶23) (Miss. 2001).

¶26.    While evidence of flight is generally admissible to show guilt, "an instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge." *Fuselier*, 702 So. 2d at 390 (¶4) (quoting *Reynolds v. State*, 658 So. 2d 852, 856 (Miss. 1995)). Trial courts must consider two factors when determining whether a flight instruction

---

[3] Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

is appropriate: "(1) only unexplained flight merits a flight instruction, and (2) flight instructions are to be given only in cases where that circumstance has considerable probative value."[4] *Id.* (citations omitted).

¶27.    In other words, if "the defendant fled for some reason independent of the crime," the flight is considered "explained" and thus inadmissible. *Harrell v. State*, 134 So. 3d 266, 276 (¶34) (Miss. 2014) (citing *Austin*, 784 So. 2d at 194 (¶25)). "Flight is 'unexplained' [and thus admissible] if there is no explanation for it other than the defendant's guilt or guilty knowledge." *Id.* Moreover, the longer the time period between the crime and the flight, the more closely a court should examine its probative value. *Ervin v. State*, 136 So. 3d 1053, 1060 (¶23) (Miss. 2014); *see also United States v. Myers*, 550 F.2d 1036, 1051 (5th Cir. 1977) ("The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.").

¶28.    Here, prior to trial, the defense filed a motion in limine to bar the State's introduction of flight evidence. Defense counsel also sought to have rebuttal evidence supporting the explanation of Kuebler's flight presented to the jury. Defense counsel explained by proffer

---

[4] In *Austin*, the supreme court stated that the two-prong test must be met for the introduction of flight evidence, even when a flight instruction has not been requested. *Austin*, 784 So. 2d at 194 (¶¶24-25). The supreme court in *Fuselier* implicitly stated evidence of flight is inadmissible when independent reasons exist to explain the flight. *Id.* at 194 (¶25) (quoting *Mack v. State*, 650 So. 2d 1289, 1309 (Miss. 1995)). "If a prosecutor cannot give a jury instruction on flight because evidence of flight is probative of things other than the defendant's guilt or guilty knowledge, it follows that the prosecutor should not be allowed to place the evidence before the jury." *Id.* (quoting *Mack*, 650 So. 2d at 1310). Here, Kuebler argues both the introduction of evidence and the giving of a flight instruction were error.

the following. After his arrest in June 2010, Kuebler claims he was taken to the Raymond Detention Center, where he was beaten.[5] Approximately three months later, in October 2010, Kuebler was released on bond and placed on house arrest, where he remained, without incident, for eight months. In July 2011, Kuebler was involved in a traffic accident and was taken to the hospital, where he was approached by law enforcement, who told him they were taking him back to the Raymond Detention Center.[6] Kuebler feared another beating; so he cut his ankle monitoring device and fled to Louisiana.

¶29.   The trial judge ruled that the flight evidence's probative value outweighed any prejudicial effect. At trial, the State called Dennis Grant, the offender-services coordinator for Kuebler's house-arrest-monitoring probation company, and Trooper John Dauzat of Alexandria, Louisiana. Both individuals gave testimony about Kuebler's July 2011 flight.

¶30.   Kuebler proffered an independent reason for his fleeing – he did not want to return to the Raymond Detention Center for fear he would again be beaten. Kuebler supplemented by proffer an explanation of his flight: a medical entry dated the day of Tamra's murder to prove he was injured in an altercation with JPD, and Kuebler's civil lawsuit, both of which were entered into evidence for identification purposes only.[7]

---

[5] In June 2011, Kuebler filed a federal civil suit against JPD and Hinds County regarding these alleged beatings, but he terminated the suit one month later. This document and other related materials were marked only for identification purposes at trial.

[6] Kuebler provided no documentation of a traffic accident, or being approached by law enforcement in the hospital.

[7] At trial, the defense sought access to certain records from the Raymond Detention Center, including videos of Kuebler's alleged beating after his initial arrest, which no longer existed. Kuebler also wanted to have the treating physician at the detention center testify,

¶31.    We find the evidence was sufficient to establish error with the trial court's ruling on the admission of the flight evidence.  Further, the time frame from the commission of the crime to the alleged flight was lengthy – over one year – causing the alleged flight information to be more prejudicial than probative under Rule 403.  In *Ervin*, our supreme court questioned whether evidence of flight was even remotely probative of guilt when the flight occurred only three weeks after arrest.  *Ervin*, 136 So. 3d at 1060 (¶23).  Here, we have no reason to link Kuebler's flight to consciousness of guilt for the crime that occurred more than one year previously.

¶32.    Additionally, the jury was instructed, over the defense's objection, that Kuebler's flight could provide an inference of guilt.  Instruction S-6 provided:

> "Flight" is a circumstance from which guilty knowledge and fear may be inferred.  If you believe from the evidence in this case beyond a reasonable doubt that the defendant . . . did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case.  You will determine from all facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt or innocence of the defendant.

¶33.    Jury instructions on flight are even more limited than admissible evidence of flight. *See Tran v. State*, 681 So. 2d 514, 518-19, 521 (Miss. 1996) (similar jury instruction condemned by supreme court for failing both prongs of flight-instruction test; murder conviction reversed on other grounds); *Banks v. State*, 631 So. 2d 748, 751 (Miss. 1994)

---

but the trial court denied the request, stating the testimony would have no probative value. Further, the physician would only be able to testify to the existence of Kuebler's injuries, and not what caused them.  The State points out Kuebler's injuries treated in the detention center could have also come from his fight with police while being arrested at the scene, and thus may not be proof of any fight at the jail.

(reversible error to give jury instruction calling undue attention to defendant's flight). In this case, we find the trial court erred in admitting evidence of Kuebler's flight and the instruction allowing the jury to consider his flight as consciousness of guilt.

¶34. Our supreme court has found flight instructions to be harmless error in certain instances. For example, in *States v. State*, 88 So. 3d 749, 758 (¶37) (Miss. 2012), the defendant provided evidence that immediately after committing two murders, he traveled to Miami, Florida, to see his girlfriend. There was no evidence of a pursuit, or the belief the defendant "was about to be discovered." *Id.* Thus, the supreme court found the defendant's flight was properly explained and not especially probative of guilt, making the flight instruction improper, but harmless due to the overwhelming evidence of guilt. *Id.* at (¶38). Similarly, in *Shaw*, the supreme court found the defendant had an independent reason for fleeing – attempting to escape lawful confinement, which is an independent crime from the one with which he was charged. *Shaw*, 915 So. 2d at 447-48 (¶19). The admission of flight evidence was thus error, but harmless due to the direct evidence of guilt. *Id.* at 448 (¶22).

¶35. Kuebler expressed an independent reason for his flight – to avoid returning to the detention center. Also, he may have attempted to elude arrest in Louisiana because he violated his bond conditions. Therefore, it was error for the jury to be instructed that it could infer guilty knowledge of Tamra's death from the flight. However, we find the error harmless beyond a reasonable doubt. "'[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *Smith v. State*, 986 So. 2d 290, 299 (¶31) (Miss. 2008) (quoting *Brown v. United States*, 411 U.S. 223, 231 (1973)). "An error is harmless if

14

'it is clear beyond a reasonable doubt that it did not contribute to the verdict.'" *States*, 88 So. 3d at 758 (¶38) (quoting *Kolberg v. State*, 829 So. 2d 29, 48 (¶35) (Miss. 2002) (overruled on other grounds)). Here, the trial court's error did not contribute to the verdict.[8]

## II. Gunshot Residue Test Results

¶36. Kuebler argues that the State's "belated disclosure" of the results of Tamra's gunpowder-residue test prejudiced his defense and violated his right to due process by depriving him of an opportunity to present his defense theory. Specifically, Kuebler argues that the trial court erred in denying his motions for a mistrial and continuance when the State announced the test results the third day of trial.

¶37. Whether to grant a mistrial lies with the sound discretion of the trial court, and refusal to grant a mistrial is reviewed on appeal for abuse of discretion. *Clark v. State*, 40 So. 3d 531, 538 (¶14) (Miss. 2010). A mistrial will be granted if the court determines that an error in the proceedings substantially or irreparably prejudiced the defendant's case. *Id.* The trial judge is in the best position to determine any prejudicial effect. *Harrell*, 947 So. 2d 309, 316 (¶23) (Miss. 2007). Similarly, the decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless the ruling resulted in manifest injustice. *Shelton v. State*, 853 So. 2d 1171, 1181 (¶35) (Miss. 2003).

¶38. Kuebler explained that prior to trial, the defense's aim was to prove Tamra committed

---

[8] Kuebler also argues that the trial court erred in disallowing him from rebutting or explaining his actions. He claims his fundamental right to present his theory of the case was violated by this ruling. We disagree, and find no merit to this claim as we find the court's errors regarding flight did not contribute to the verdict.

15

suicide or accidentally shot herself. The first two days of trial, the defense attempted to show that the police investigation was inept – the police should have swabbed Tamra's hands for a gunshot-residue test, but did not. However, Tamra's hands were swabbed by forensic pathologist Dr. Feng Li, who performed her autopsy. Her gunshot-residue-test kit was received by MCL on June 30, 2010, the day of her death.

¶39. Kuebler's hands were tested shortly after police took him into custody on June 30, and the sample was received by MCL for testing on July 22, 2010. Kuebler tested positive for gunpowder on both hands, and the results were sent to the State. The MCL did not, however, perform an analysis on Tamra's kit, as it is standard policy at the MCL not to perform tests on gunshot-residue kits of victims. Thirty days after receiving the kit from Dr. Li, the MCL returned it to the State (JPD).

¶40. At trial, the parties disputed what occurred at a September 14, 2011 meeting between the State and defense counsel. The defense claimed the State did not provide Tamra's gunshot-residue kit for examination at the meeting. The State denied this accusation, stating the kit was labeled and in the evidence bag that the defense inspected. The State explains this dispute is important because, at the meeting, the defense viewed the kit, asked why it had not been tested, and asked the State to return it to MCL for analysis (which it did on November 28, 2011 – the first day of trial). In contrast, the defense claims it did not make this request, but instead the State, for unexplained reasons, chose unilaterally to resubmit the kit to MCL.

¶41. On the third day of trial, the MCL released its report on the results of Tamra's

16

gunpowder-residue test to the State, and the State provided the report to the defense. The results showed gunshot-residue particles on the back of her right hand and palm, and the back of her left hand.[9] Upon this announcement, the defense moved for a mistrial, or in the alternative, a continuance, claiming that it was prejudiced by the "belated" disclosure of this evidence because of its theory of accident or suicide. But the State claimed the defense knew that the kit was submitted for testing on the first day of trial; thus, the test results were not "belated." Later, the defense renewed its motion for a continuance, and requested the State produce Tamra's actual gunpowder-residue kit, explaining that analyzing the kit would tell the proximity of the individual to the weapon and more information on who was holding the gun when it discharged. The defense also wanted to find an expert to testify about the results, and to conduct additional testing, such as a blow-back test and an analysis of Kuebler's and Tamra's clothing. The trial court denied the requests for a continuance and mistrial as the defendant alleged the evidence was exculpatory and favorable to the defense.[10]

¶42. Defense counsel complained that its entire case, up to the point the results were presented, was premised on the unavailable gunshot-residue analysis from Tamra's hands showing "shoddy" police work; thus, Kuebler's defense was prejudiced by the late disclosure of the test. However, we fail to see how the defense was prejudiced by this evidence, as the results of the test did not undermine the defense theory of accident or suicide. Nor did it

---

[9] The report also showed particles *indicative* of gunshot-residue particles on samples taken from the back of Tamra's right hand and palm, and the back of her left hand and palm.

[10] The defense also moved for a mistrial when, towards the end of the trial, the defense had still not received Tamra's actual gunshot-residue kit, which the State had been ordered to produce. The trial court denied this motion as well.

17

diminish Kuebler's argument about faulty police practices. The police had not, in fact, conducted the test. Regardless of whether Tamra had gunshot residue on her hands, her autopsy undisputedly showed that the gun was fired from two and one-half to three feet away, and the bullet traveled in a downward trajectory through her forehead. Further, Jacob Birchfield, a trace-evidence analyst with the MCL, testified that when a firearm is discharged, it leaves a plume of two to three feet of gunshot residue, so any object in that range will test positive for gunshot residue. Thus, he stated it is not uncommon for victims of a gunshot to have residue on them, which is why it is the policy of the MCL not to perform gunshot-residue kits on victims – "it would not add any probative value to do a report on the victim."

¶43. The denial of Kuebler's request for a continuance to find another gunshot-residue expert for further testing was not in error. At trial, Kuebler's counsel explained he wanted to find an expert to show that Tamra had more gunshot residue on her hands than the defendant, in the hope of suggesting Tamra killed herself. However, Kuebler already had an expert, whom he did not call at trial, who had already opined that the presence of gunpowder on Kuebler's hands did not mean Kuebler fired the gun used to kill Tamra. Kuebler did not explain why he could not have called this expert to the stand instead of requesting time to find another expert.[11]

¶44. Kuebler also argues that the State was obligated to disclose any favorable evidence

---

[11] Additionally, the defense did not explain why it had not conducted blow-back or clothing analyses previously; these were not dependent upon any gunshot-residue analysis of Tamra's hands.

18

to him where the evidence was material to guilt or punishment, regardless of the good faith of the prosecutor, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

> In determining whether a *Brady* violation occurred, thus mandating a new trial, . . . [t]he defendant must prove: (a) that the State possessed evidence favorable to the defendant[;] . . . (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Manning v. State*, 929 So. 2d 885, 891 (¶15) (Miss. 2006).

¶45.    In support of his argument on the late disclosure of exculpatory evidence, Kuebler cites *Shaffer v. State*, 740 So. 2d 273, 280 (¶25) (Miss. 1998), where the supreme court commented on the reprehensibility of the prosecution's misleading actions, but reversed on other issues.  In *Shaffer*, the State testified at a pretrial hearing about results from the victim's toxicology tests, yet at trial it was revealed that no tests had been run on the victim.  *Id.* at 279 (¶23).  This information was crucial because, without it, physicians were unable to determine the cause of her death, which may have been a drug overdose.  *Id.* at (¶24). However, here, there is no evidence that the State deliberately misled or "exploited" the defense.  The State fully explained the MCL's policy is not analyzing gunshot-residue kits for gunshot victims and its determination that the results would not be probative.

¶46.    While Kuebler admits that untimely disclosure of *Brady* material does not constitute a constitutional violation in itself, he claims due process was violated because he was prejudiced by the delay – he could not present his theory of the case in a coherent manner, and was deprived of seeking expert analysis that would show Tamra fired the gun.  Again,

19

we are not persuaded by these arguments. The State disclosed the results of the test as soon as they were obtained, on the third day of trial. Kuebler fails to prove the *Brady* factors, especially that the defense could not obtain the test kit, that the State suppressed any evidence, or that the outcome of the trial would have been different.

¶47. The trial court did not abuse its discretion in denying Kuebler's motions for a mistrial or continuance.

### III. Evidence of Victim's Drug Use and Mental State

¶48. Kuebler argues the trial court committed reversible error in granting the State's motion in limine to exclude evidence that Tamra had used drugs and alcohol prior to her death. Additionally, Kuebler claims that the trial court erred in allowing the State to introduce text messages composed and sent just prior to her death, and yet improperly denied Kuebler's request to introduce additional text messages he claimed were also relevant. The well-established standard of review for the admission or exclusion of evidence is abuse of discretion. *Smith v. State*, 839 So. 2d 489, 494 (¶6) (Miss. 2003).

### A. Tamra's Toxicology Report

¶49. The State filed a supplemental motion in limine to exclude evidence of Tamra's toxicology report, which showed drugs and alcohol in her system at the time of her death,[12] as well to as to exclude evidence of prescription drugs in her purse. The State attached to the

---

[12] The report was ultimately marked for identification only, and showed Tamra had ingested a wide variety of drugs.

20

motion an unsworn statement by Dr. Steven Hayne dated November 16, 2011.[13]  The defense

argued that this evidence was relevant to Tamra's state of mind at the time of her death, and

supported its theory that "the gun fired when Tamra was holding it and threatening to commit

suicide."[14]  When the motion was initially argued, the trial judge asked if the defense had any

evidence of Tamra's shooting herself, because before he entered her toxicology report into

evidence, he needed something more than "mere speculation."  Defense counsel answered

---

[13]  In the statement, Dr. Hayne opined that the case is "not likely a homicide" because Kuebler had no "motive" to kill Stuckey.  He further stated:

> The decedent's toxicological analysis was noted to have drugs and medications to include MDMA, MDA, hydrocodiene/hydrocodone and dihydracodeine that can produce hallucinogenic and[/]or paranoid behavior and[/]or aggression, agitation, and delusional thought processes.  In addition, ethyl alcohol was present and can have an additive effect to these drugs identified in the decedent's blood toxicology specimen.  Ethyl alcohol and xanax (which was found in the toxicology sample) can act in a synergistic manner and in [and] of themselves have an additive effect to cause depressive symptoms.

> These conclusions are made in the light of the drugs and alcohol that were reported to be present in her blood toxicology specimen at the time of death and could have caused her to become manic, paranoid, delusional, and[/]or out of touch with reality.  If, in that state, she had picked up a gun this would be in [and] of itself a dangerous situation[,] and one could not determine her intentional use of that weapon.  It is reasonable that she could have been shot accidentally while her friend was attempting to wrest the gun from her.  There is nothing in the evidence inconsistent with this conclusion.  She could have pointed the gun at herself or her friend, but it is not likely a homicide because there is no motive, no witness statements, and no testifying consistent with homicide.

[14]  The defense also filed a motion in limine seeking to exclude evidence that Kuebler had used drugs and alcohol prior to Tamra's death, arguing: "If the decedent's drug use is irrelevant, the State must concede that any drug use by Kuebler is also irrelevant."  The trial court ruled Kuebler's use of alcohol was admissible, but his use of drugs was not.

that "we don't have any evidence to that effect other than just her condition" unless the defendant testified. The judge then reserved ruling on the motion, stating that any evidence of Tamra's drug use could not be brought up until he ruled upon it. Later, before opening statements, the trial judge similarly ruled in more detail:

> The victim's drug use and alcohol use is proposed to be proffered into evidence by the defendant. Generally, under Mississippi Rule of Evidence 404, a victim's character is not relevant. Case law provides certain exceptions to this general rule. Whether the defendant claims self-defense or where he claims the victim was the aggressor, character evidence can be admissible. Herein the defendant was not claiming self-defense. Further, there is no evidence the victim was the aggressor. The defendant claims that the victim was attempting to shoot herself and that claim is pure speculation at this point. And the court has heard nothing but speculation in that regard. At this point, the court finds that any evidence regarding the victim's drug use is not relevant and is not admissible. If during the trial evidence is presented to show that the victim was the aggressor or that she was trying to shoot herself, then the court will revisit this ruling.

¶50. It is elementary that the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). Further, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Corbin v. State*, 74 So. 3d 333, 338-39 (¶13) (Miss. 2011). Kuebler now argues that he was unconstitutionally restrained from informing the jury on his theory of the case, and thus denied a fair trial. He claims to be effectively barred from calling his own expert, Dr. Hayne, who was to focus on the toxicology evidence, and testify that the combination of drugs and alcohol in Tamra's system when she died produced "hallucinogenic and/or paranoid behavior and/or aggression, agitation and delusions, [as well as] depressive systems." He also asserts that the trial court erred in not

22

allowing him to cross-examine certain witnesses about drug use the evening Tamra died, which was relevant to support his theory that Tamra could have been involved in the circumstances of her own death by either suicide or accident. These witnesses include Dr. Li, the State's expert forensic pathologist, as well as Nate, Jennifer, and Aaron.

¶51. We find the trial court's ruling excluding Tamra's toxicology report was not an abuse of discretion. Evidence of a victim's character is governed by Mississippi Rule of Evidence 404. A victim's intoxication is relevant to demonstrate all the conditions existing at the time of and giving rise to the killing, including the victim's mental state, but only to determine whether the defendant acted in self-defense. *Byrd v. State*, 154 Miss. 742, 749, 123 So. 867, 869 (1929). "In self-defense cases, the defendant may show the deceased's intoxication as bearing upon the victim's mental state, motive and intention, as well as the defendant's belief in the imminence of his danger." *Id.* Here, Kuebler is not claiming he killed Tamra in self-defense; he claims he did not kill her – it was an accident or suicide. Thus, under *Byrd*, evidence of the victim's intoxication is irrelevant.

¶52. Further, during the pretrial hearing on this issue, Dr. Hayne did not appear to testify. Defense counsel stated Dr. Hayne would be called to testify at trial to offer his opinion on the cause and manner of Tamra's death; however, Dr. Hayne was never called to testify at trial, nor was he called to provide a proffer that Tamra's drug usage may have made her suicidal. No foundation was laid for admitting evidence of Tamra's drug use. Dr. Hayne's unsworn statement did not say that "to a reasonable degree of medical certainty" the drugs caused Tamra to commit (or attempt) suicide, but merely speculated on possibilities that the

23

drugs caused her to become manic or delusional, using such words as "can" and "could." Further, there were no facts to support his contentions. Kuebler never testified; therefore, there was absolutely no evidence of Tamra's threatening suicide – it was merely speculation.

¶53.    Also, when the results of Tamra's gunshot-residue test became available, defense counsel sought to examine Dr. Li to see if her toxicology report factored into his opinion that her death was a homicide. The court denied counsel's request, and counsel did not request a proffer of the cross-examination of Dr. Li for the effects of the drugs in her system. In sum, Kuebler never submitted any evidence showing a nexus between Tamra's toxicology results at the time of her death and her alleged suicidal actions during the shooting. Accordingly, her toxicology report was not relevant, and the trial court did not err in excluding it from evidence.

### B.    Tamra's Text Messages

¶54.    Kuebler sought to introduce several text messages Tamra sent within twenty-four hours of her death. He argued these messages show her suicidal state of mind, and that there was no conflict between Kuebler and Tamra. Kuebler now claims the rulings of the trial court on these text messages denied him his fundamental right to present a defense.

¶55.    The trial court denied Kuebler's motion in limine to bar the State from introducing a text message sent by Tamra to her friend Kirby about an hour before her death, where she wrote: "Wake up . . I need [yo]u to save me." Alternatively, the defense sought to introduce other text messages from Tamra that were sent within twenty-four hours of her death that allegedly provided a context for Tamra's mental state. The trial court denied this request,

24

and the text messages were admitted for identification only. The trial judge found the texts not sufficiently probative and inconsistent with Rule 404(a), which bars character evidence regarding the victim. The trial court also denied the defense's request to introduce text messages between Tamra and Kirby during Kirby's cross-examination.

¶56. The defense argued that the text messages show Tamra to be depressed and anxious. Tamra sent a text to Jennifer on June 29 at 12:41 p.m., approximately thirteen hours before her death, confessing her affection for Kuebler. Messages show she was also concerned about her inability to pay approximately $300 for repairs to her van, in a text sent at 4:33 p.m. to Kirby. Some of her texts also indicate drug usage approximately fourteen hours prior to her death. Other texts discuss Tamra's buying pizza, and asking her boss whether she had to work on the Fourth of July.

¶57. We cannot say the trial court abused its discretion in refusing to allow these additional texts into evidence. Mississippi Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of . . . needless presentation of cumulative evidence." Thus, if relevant evidence produces prejudice, confusion, or waste of time, it can be excluded under Rule 403. Most of the texts have nothing to do with whether Tamra was suicidal. Her texts expressing her feelings for Kuebler and worry about payment of automotive repairs are not probative of suicide. Additionally, the texts about her drug usage the day of her death are inadmissible for the same reason as the prior issue. The trial court did not err in excluding these text messages.

25

**IV.    Evidentiary Rulings on Hearsay Statements**

¶58.    Kuebler argues the trial court erred in making certain evidentiary rulings, violating his right to a fair trial.  First, he claims the court erred in allowing the State to introduce the text message Tamra sent Kirby approximately one hour before her death, stating, "Wake up . . I need [yo]u to save me."  Second, Kuebler contends the trial court erred in allowing the State to elicit testimony about a telephone conversation Tamra had with Jennifer and Nate shortly before her death.  Finally, Kuebler claims the trial court erred in denying the grant of a mistrial after Detective Maurice Kendrick testified that he had learned during the police investigation Tamra "was possibly shot with a weapon that was in the location by a Mr. Charles Kuebler."  Kuebler claims these statements are inadmissible hearsay and violated his right to confront witnesses.

¶59.    "[T]he admissibility of testimonial evidence is left to the sound discretion of the trial court within the boundaries of the Mississippi Rules of Evidence, and it will not be found in error unless it has abused its discretion." *Harris v. State*, 861 So. 2d 1003, 1018 (¶41) (Miss. 2003).  Hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c).

¶60.    Before trial, the trial court denied the defense's motion in limine to bar the introduction of this text message and testimony about Tamra's call to Jennifer and Nate.  At trial, testimony was presented that Tamra called Nate and Jennifer at approximately 1:15 a.m., or about one hour before Tamra died.  Jennifer testified that Tamra was upset because

26

Kuebler was "being mean to her." Tamra was crying. Jennifer invited her over, but Tamra did not want to "walk past [Kuebler] to get to [Jennifer's] apartment" and "make matters worse." Nate spoke to Tamra, recommending she get away from Kuebler and sleep. At 1:35 a.m., Tamra sent Kirby a text stating, "Wake up . . I need [yo]u to save me." At trial, Detective Kendrick read this text message to the jury, over the objection of defense counsel. Later, Kirby testified about the text message as well.

¶61. The statements are all admissible as hearsay exceptions, specifically present sense impressions, or to show Tamra's existing mental state. Mississippi Rule of Evidence 803(1) provides for a present-sense-impression exception, and Rule 803(3) excepts a then-existing mental or emotional state. Moreover, a relevant statement made by a murder victim prior to her death may be admissible as an exception to the hearsay rule under Rule 803(3). *See Brown v. State*, 890 So. 2d 901, 914-15 (¶¶44-45) (Miss. 2004) (witness's hearsay statement allowed when he was able to form an opinion on the victim's and defendant's emotional states). Here, Kuebler put Tamra's emotional state at issue by arguing she committed or attempted to commit suicide.

¶62. Tamra's text to Kirby and conversation with Jennifer and Nate were admissible hearsay under Rule 803(1) because they occurred shortly before her death, which was at approximately 2:15 a.m., and both describe "an event or condition made while [Tamra] was perceiving the event or condition or immediately thereafter." Both statements also show Tamra's then-existing mental or emotional state – she was crying and upset. Even though Tamra's text did not mention Kuebler by name, it was relevant as to whether and why Tamra

27

needed "saving," and also expresses that she needed help.

¶63. Finally, the trial court did not err in refusing to grant a mistrial regarding Detective Kendrick's response to the question "what did you learn about the shooting?" Detective Kendrick testified that he learned Tamra was possibly shot by Kuebler. Detective Kendrick was one of eight police officers to testify similarly, and defense counsel did not object to them. They all testified that they found Kuebler and Tamra alone, covered in blood, at the time of the shooting. The statement was harmless and does not warrant a new trial.

## V. Evidence of Bad Character and/or Acts

¶64. Kuebler claims the trial court made two erroneous rulings that allowed the jury to hear prejudicial and improper evidence regarding his character or prior bad acts. First, the judge allowed testimony and a photograph of some "white powder" on a tray, a razor blade, and a rolled up bill of money found in Kuebler's apartment. Second, law enforcement testified about Kuebler's belligerence, including his use of racial slurs, outside of his apartment with the police. Kuebler argues this evidence resulted in a guilty verdict based on his bad character rather than commission of any crime, and he should be granted a new trial.

¶65. Even though evidence of prior bad acts is admissible under Rule 404(b), it must still "pass through the 'ultimate filter' of [Rule] 403." *Flowers v. State*, 842 So. 2d 531, 540 (¶25) (Miss. 2003). An appellate court will not reverse a trial court's judgment for the admission or exclusion of evidence unless the court abused its discretion. *Mingo v. State*, 944 So. 2d 18, 28 (¶27) (Miss. 2006).

¶66. Regarding the white powder, Sergeant Freeman testified about what he observed at

28

the crime scene. On a "quick walk through" of the apartment, he found a TV tray in an upstairs bedroom with white powder on it. Defense counsel's objection to this statement was overruled. When defense counsel cross-examined Freeman, he conceded he did not know if the powder had anything to do with Kuebler and Tamra. On redirect, the State asked Freeman if he thought the white powder was drugs, and he responded that it appeared to be cocaine. Defense counsel objected and moved for a mistrial. The trial court then instructed the jury to disregard the comment about the alleged cocaine.

¶67. The State agrees with Kuebler's argument that there was no testimony that the powder belonged to him, or that he used it that night. And we agree with the State that Freeman's testimony did not consist of prejudicial reversible error. The substance was never connected to Kuebler or Tamra. Further, the limiting instruction to the jury was adequate to correct any possible prejudice. "It is presumed that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." *Chase v. State*, 645 So. 2d 829, 853 (Miss. 1994) (quoting *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)).

¶68. We also find no error regarding the admission of Kuebler's belligerent behavior and use of racial slurs with JPD police officers at the scene.[15] Officers Freeman, West, and Seals all testified that, upon arrival at the crime scene, they took statements from each witness in the back of a patrol car, as is typical procedure. Kuebler was the only witness who did not comply with the process; he became belligerent, used racial epithets against the officers, and ultimately kicked out the window of a patrol car. Kuebler maintains that he behaved in this

_____

[15] The defense's pretrial motion to prevent the State from introducing this evidence was also denied.

29

manner because he felt police officers were not attending to Tamra sufficiently, and yet she was already deceased. He claims the prejudicial impact outweighs the probative value of this testimony. Kuebler argues his remarks were not relevant to the issues, but were only used as evidence of his alleged bad character and to inflame the jury.

¶69. We are not persuaded by this argument. Mississippi recognizes that "an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Jimpson v. State*, 532 So. 2d 985, 990 (Miss. 1988) (citation omitted). "Evidence of other crimes or bad acts is also admissible in order to tell the complete story so as not to confuse the jury." *Ballenger v. State*, 667 So. 2d 1242, 1257 (Miss. 1995).

¶70. Kuebler's actions in response to the police investigation at the scene are admissible as evidence of consciousness of guilt, and are part of the context of the situation. The probative value of Kuebler's actions immediately following Tamra's death is high, and outweighs any prejudicial impact under Rule 403. He was not under arrest at this point, but still did not cooperate with police about giving a statement.

¶71. Further, it was not unduly prejudicial under Rule 403 for the trial court to allow testimony of Kuebler's racial slurs to African American police officers during the altercation. Race was not interjected into the case except to show Kuebler's actions and attitude towards the police upon arrival at the crime scene. No evidence of racial bias was presented related to Tamra either. *See Bell v. State*, 910 So. 2d 640, 646 (¶15) (Miss. Ct. App. 2005) (defendant's derogatory racial statements did not move jury to decide case on an "improper

30

basis"; mention of race was not unduly prejudicial).  Accordingly, the trial court did not abuse its discretion on these evidentiary matters.

## VI. Prosecutorial Misconduct

¶72.    Kuebler claims the following three instances of prosecutorial misconduct prejudiced him sufficiently to merit a new trial:  suggesting that the defense tampered with a witness during the State's examination of a witness and closing argument; mentioning facts about Tamra that were not in evidence during closing argument; and allegedly eliciting testimony about Kuebler's right to counsel.

¶73.    "Attorneys are allowed a wide latitude in arguing their cases to the jury.  However, prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000) (citing *Hiter v. State*, 660 So. 2d 961, 966 (Miss. 1995)).  "The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Id.* (citing *Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992)).  "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Grayson v. State*, 118 So. 3d 118, 139 (¶60) (Miss. 2013) (quoting *Manning v. State*, 735 So. 2d 323, 345 (Miss. 1999)).

### A. Perjury and Witness Tampering

¶74.    At trial, the State elicited testimony from eight police officers present at the crime scene the night of Tamra's death. A photograph of the gun lying on the floor next to the couch where Tamra's body lay was also introduced into evidence. The gun is near Tamra's head. The prosecutor asked each officer if the gun had been moved or touched while officers were at the scene. Each officer stated it had not. Two officers, Officer Snow and Detective Kendrick, testified as to where they remembered seeing the gun. Officer Snow testified he found the gun on the floor near Tamra's feet; Detective Kendrick testified it was near her head. Aaron (who is not a police officer but was present on the scene before they arrived) later testified he remembered seeing the gun on the floor closer to Tamra's feet. Defense counsel took these inconsistencies, and especially Officer Snow's testimony, as proof police may have tampered with the evidence at the crime scene.

¶75.    During his cross-examination, Officer Snow stated he did not move the gun, never saw anyone else move the gun, and did not even know the gun had in fact been moved. Throughout Kuebler's trial, defense counsel continued to emphasize that the police tampered with the evidence. Accordingly, during closing argument, the State suggested Officer Snow had perjured himself when he considered that the gun may have been moved (although he never expressly stated this possibility). The defense objected, and the judge instructed the jury to disregard the statement.

¶76.    Kuebler argues that defense counsel properly utilized Officer Snow's discrepancy in where the gun lay to show apparent flaws in the police investigation and cast doubt on Kuebler's charges. The State claims that it was merely responding to an attack by the

32

defense – defense counsel persistently and falsely characterized Officer Snow's testimony, which opened the door for the State to attack Officer Snow's testimony as a possible lie. However, the State now claims that none of the officers lied on the stand. We do not find the prosecutor's improper comment unduly prejudiced Kuebler or inflamed the jury. The trial court sustained defense counsel's objection and told the jury to disregard the comment. This issue is without merit.

### B.    Tamra's Life

¶77.    Kuebler next complains that during closing argument, the prosecutor provided details about Tamra's life that were not in evidence:

> Tammy attended the University of Southern Mississippi. She was employed at the Beagle Bagel Café. She was well loved by her friends and family. She was a kind, sweet-spirited person. She also had two small nieces who she spent a lot of time with. . . . Tamra touched a lot of lives.

Trial counsel is limited to arguing facts introduced in evidence, deductions and conclusions from this evidence, and the application of the law to the facts. *Holland v.* State, 705 So. 2d 307, 343 (¶137) (Miss. 1997). The State concedes this information was not in the record. However, we fail to see how this information could prejudice Kuebler to the extent it caused the jury to find him guilty of murder.

¶78.    Additionally, Kuebler complains that the prosecutor stated in closing argument that Tamra and Kuebler had an intimate relationship, but this fact lacks evidentiary support. Kuebler somewhat misconstrues what was said – the prosecutor actually stated: "[W]e learned that this defendant and Tamra had some kind of relationship, *perhaps* [an] intimate relationship, several months preceding her death." (Emphasis added). According to the

evidence, the prosecutor's statement is accurate. It is unclear whether Tamra and Kuebler were in an intimate relationship, but Aaron testified that Kuebler told him he had accidentally shot Tamra when they "were fooling around with each other and she enjoyed him holding the gun to her head while they had sex." This issue is without merit.

### C. Invocation of Right to Counsel

¶79. The defense filed a pretrial motion in limine to prohibit the State from mentioning before the jury that Kuebler sought legal assistance during his interrogation. The motion was uncontested by the State and granted by the trial judge. Kuebler claims the State "reneged" during the direct examination of Detective Felix Hodge, causing him prejudice. The following colloquy occurred between the prosecutor and Detective Hodge:

Q. And your purpose for bringing [Kuebler] into your office was what?

A. To get a statement of what happened on the scene.

Q. And did you do anything else when you came into contact with the defendant Kuebler?

A. No. After I advised him of his rights, he advised he needed a lawyer. At that time, I conducted a gunshot residue kit.

Defense counsel objected to the comment about Kuebler seeking legal assistance, and the related bench conference on the objection was later put on the record. Counsel argued that the State had violated the motion in limine, and the line of questioning infringed on his client's right to counsel and right against self-incrimination. Defense counsel requested a mistrial, which was denied.

¶80. In granting a mistrial, the trial court is to ask if the error that occurred in the

proceedings "substantially and irreparably prejudiced the defendant's case." *Clark v. State*, 40 So. 3d 531, 538 (¶14) (Miss. 2010). On issues related to comments concerning a defendant's failure to testify or right to remain silent, "each case shall be considered on an individual basis." *Birkhead v. State*, 57 So. 3d 1223, 1238 (¶53) (Miss. 2011) (quoting *Weeks v. State*, 804 So. 2d 980, 993 (¶43) (Miss. 2001)). While the supreme court has recognized "the need to protect the constitutional rights of every citizen," it has also held that such comments by prosecutors may be "corrected by the jury instructions." *Id.*; *see Strahan v. State*, 729 So. 2d 800, 807 (¶¶28-30) (Miss. 1998) (finding the prosecutor's comment on the defendant's right to remain silent both during the investigation and the trial was error but not reversible error, as an instruction was given to the jury to ignore the comment).

¶81. Here, the prosecutor was not eliciting testimony from Detective Hodge about whether Kuebler invoked counsel; Detective Hodge incidentally offered the information as he was answering a question about why Kuebler was brought to his office. As in *Strahan*, given the context of the comment and the content of the written instructions, there is no reversible error. Further, two jury instructions were given, which corrected the issue. Jury Instruction 1 prohibited the jury from considering the prosecutor's comments as evidence. Jury Instruction 9 instructed the jury that Kuebler was presumed innocent, and the jury could not form any unfavorable inferences about him because of his refusal to testify. Therefore, this issue is without merit.

### VII. Waiver of Right to Testify

¶82. Kuebler submits that the trial court erred in failing to engage him in a colloquy about

his fundamental right to testify in his own defense. The Mississippi Constitution provides the accused the right to testify on his own behalf. *Culberson v. State*, 412 So. 2d 1184, 1186 (Miss. 1982). The supreme court suggests a record should be made about whether the defendant wants to testify. *Id.* However, this advice is not a requirement, but merely a suggestion. *Shelton v. State*, 445 So. 2d 844, 847 (Miss. 1984).

¶83. Here, the record is silent as to whether Kuebler intended to waive his right to testify. However, as the State points out, many of the bench conferences at trial were not transcribed by the defense, and there is no record of whether there was a colloquy about Kuebler's right to testify, or whether he waived it. Accordingly, we dismiss this issue without prejudice in order that Kuebler may have the opportunity to pursue it in proper post-conviction-relief proceedings.

## VIII. Jury Instructions

¶84. Kuebler argues the trial court made several errors with regard to jury instructions. The standard of review for the refusal of jury instructions is abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010).

> In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law.

*Id.* at 73-74 (¶20) (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006)). Moreover, "a defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction

36

which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id.* (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008)). "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Williams v. State*, 803 So. 2d 1159, 1161 (¶7) (Miss. 2001).

### 1.    Proposed Jury Instruction D-10:  Accident Theory

¶85.    Jury instruction D-10, in pertinent part, informed the jury that it could find Kuebler "not guilty" if it found reasonable doubt that his actions were either:  "1.  The result of an accident or misfortune while the Defendant was doing a lawful act by any means, with usual and ordinary caution, and without unlawful intent; or 2.  The result of an accident or misfortune, in the heat of passion, upon sudden and sufficient provocation . . . ."[16]  The trial court refused this instruction because of a lack of supporting evidence.

¶86.    Kuebler argues this instruction articulates his theory of defense that Tamra's shooting was an accident, or that she was shot while he was trying to wrest the gun away from her as she was threatening suicide.  Kuebler claims the evidence that supports his "accident theory" is his distress while seeking help from police for the deceased Tamra, a lack of any motive, Tamra's positive gunshot-residue test results, and Nate's tentative testimony that initially he believed the shooting was an accident.

¶87.    We are not persuaded by this argument.  There was insufficient evidence to warrant this instruction.  Nate changed his mind by the time of trial about the possibly accidental

---

[16] Elements three and four of the instruction suggest Kuebler acted in self-defense. When the trial court expressed concern about these references, defense counsel offered to remove them, but the trial court refused the instruction anyway.

nature of Tamra's killing. Kuebler's actions at the scene – hysterically asking the police for medical assistance for Tamra – do not necessarily imply that the shooting was an accident, nor do lack of a motive or gunshot-residue particles on Tamra's hands. As an expert testified, gunshot residue will be found in any vicinity where a gun has been fired. Aaron also testified that Kuebler stated he and Tamra were having sex when the gun discharged and killed her. These matters are not indicative of an accident; the elements of "usual and ordinary caution" or "the heat of passion" are not present in the evidence. The evidence does not show that Kuebler and Tamra were fighting the night she was shot, but that Kuebler was berating Tamra, which upset her.

¶88. The trial court did not err in refusing the defense's proposed jury instruction D-10.

### 2. Jury Instruction 10: Depraved Heart Murder; Distinction Between Depraved-Heart Murder and Culpable Negligence Manslaughter

¶89. Kuebler first argues the trial court erred in giving the State's proposed jury instruction S-1, which includes language on both deliberate-design and depraved-heart murder (ultimately given as Jury Instruction 10), which stated:

> Murder is the killing of a human being, with malice aforethought, not in necessary self-defense, and without authority of law, when done with premeditated and deliberate design to effect the death of the person killed or when done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without premeditated design to effect the death of any particular individual.

Kuebler claims there was no evidence to support depraved-heart murder, and at most, there was only evidence to support an instruction on manslaughter. Kuebler contends that the supreme court has found events involving reckless actions with a gun are not depraved-heart

murder, but at most manslaughter. *See Tait v. State*, 669 So. 2d 85, 90 (Miss. 1996) (holding evidence did not support depraved-heart murder or manslaughter, but would sustain conviction for manslaughter by culpable negligence, where defendant was "playing with a gun" and shot victim in head). Kuebler continues that even if a depraved-heart-murder instruction was proper, the jury was not adequately instructed on the distinction between depraved-heart murder and culpable-negligence manslaughter.

¶90.    We are not persuaded by Kuebler's arguments. There was ample evidence to support Jury Instruction 10, which allowed the jury to convict Kuebler of murder if the killing was of deliberate design under Mississippi Code Annotated section 97-3-19(1)(a), or evinced a depraved heart under section 97-3-19(1)(b). The Mississippi Supreme Court has held that it is not error to give a jury instruction that combines the elements of deliberate-design murder with the elements of depraved-heart murder; the elements are not mutually exclusive, but "coalesce." *Readus v. State*, 997 So. 2d 941, 943 (¶9) (Miss. Ct. App. 2008) (citing *Schuck v. State*, 865 So. 2d 1111, 1119-20 (¶¶19-20) (Miss. 2003); *Catchings v. State*, 684 So. 2d 591, 599 (Miss. 1996)). "[E]very murder done with deliberate design to effect the death of another human being is by definition done in the commission of an act imminently dangerous to others and evincing a depraved heart, regardless of human life." *Catchings*, 684 So. 2d at 599 (quoting *Mallett v. State*, 606 So. 2d 1092, 1095 (Miss. 1992)).

¶91.    Moreover, Kuebler told inconsistent stories of what happened – Tamra's death was an accident while they having sex with his holding the gun to her head, or the gun fell to the ground and accidentally discharged. Kuebler had also been belittling and berating Tamra that

39

night, and refused to cooperate with police, becoming highly belligerent when they attempted to interview him. Regardless of which version of events the jury believed, there is ample proof of reckless and eminently dangerous actions directed at Tamra.

¶92. Further, *Tait* is distinguishable; the evidence there only provided for an instruction on manslaughter by culpable negligence. *Tait*, 669 So. 2d at 90. There was one eyewitness who testified the defendant and victim and been playing with the gun all day, but there was no evidence it was the defendant's gun. *Id.* at 89. They were joking and horse-playing when the defendant cocked the gun, pointed it at the victim's head, and it went off. *Id.* Tait then fell to the ground and started crying. *Id.* There was no evidence of heat of passion or violent, uncontrollable rage engendered by provocation. *Id.* at 89-90.

¶93. Additionally, Jury Instruction 12 was not improper. It reads: "[D]epraved heart murder and culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved heart murder involves a higher degree of recklessness from which malice or deliberate design may be implied." There was a jury question on Kuebler's culpability or degree of recklessness. Accordingly, the trial court did not err in giving Jury Instructions 10 and 12.

¶94. Finally, the jury instructions were not "seriously flawed," as Kuebler contends, because they failed to instruct the jury on the difference between depraved-heart murder and culpable-negligence manslaughter. Jury Instruction 13 stated: "The killing of a human being by the culpable negligence of another, without authority of law, is manslaughter. . . . [C]ulpable negligence is defined as negligence of a degree so gross as to be tantamount to

a wanton disregard of, or utter indifference to, the safety of human life . . . ." Jury Instructions 10, 12, and 13, taken together, adequately explained the relationship between murder, manslaughter, and gross negligence. These instructions were all proper statements of the law, and there is evidence to support each one.

### IX. Sufficiency and Weight of the Evidence

¶95. Kuebler challenges both the sufficiency and weight of the evidence for his conviction of murder. In determining whether the State presented legally sufficient evidence to support the jury's verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Nolan v. State*, 61 So. 3d 887, 893 (¶24) (Miss. 2011) (quoting *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005)). All evidence supporting the guilty verdict is accepted as true, and the State will be given the benefit of all reasonable inferences that can be drawn from the evidence. *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). Regarding the weight of the evidence, the appellate court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18). The evidence will be considered in the light most favorable to the verdict. *Id.*

¶96. Kuebler was convicted as charged of deliberate-design murder, in violation of section 97-3-19(1)(a). Examined in the light most favorable to the verdict, the evidence shows Kuebler deliberately pointed the loaded gun at Tamra's head and pulled the trigger. Upon finding her body, police noted Tamra's feet were tucked into the couch as if she had been

sleeping, in a position inconsistent with a struggle or sexual intercourse. Text messages sent moments before her death show Kuebler was angry and Tamra thought she needed saving. It matters not whether Kuebler's actions were intentional or done with a high degree of recklessness, such as holding a loaded gun to a partner's head during sexual intercourse; both would constitute murder under Mississippi law. Further, the firearms-expert witness, Hathcock, testified that the gun could not have accidentally discharged. The autopsy results also showed the trajectory of the bullet through Tamra's brain and the shooting distance of two and one-half to three feet effectively ruled out suicide. Allowing Kuebler's conviction to stand does not sanction an unconscionable injustice. The sufficiency and weight of the evidence were adequate to convict Kuebler of murder.

### X. Cumulative Error

¶97. Kuebler claims his conviction should be reversed due to the aggregate effect of the errors. "[I]ndividual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007). Although we found error with the admission of evidence of flight and the related jury instruction, it was not reversible error. No prejudice occurred individually or cumulatively.

¶98. For the above reasons, we affirm Kuebler's conviction and sentence.

¶99. **THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CONCUR. MAXWELL AND FAIR,**

42

**JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY ISHEE, J.; CARLTON, J., JOINS IN PART WITH SEPARATE WRITTEN OPINION.**

**WILSON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶100. I concur in the majority's discussion and resolution of most of the claims that Kuebler raises on appeal. However, rather than affirming Kuebler's conviction and sentence at this stage, I conclude that it is necessary to remand the case to the trial court for the limited purpose of making findings of fact as to whether a discovery violation occurred. If such a violation occurred, I believe that a continuance or mistrial would have been required. The trial judge appears to have resolved the issue on other grounds, but I submit that the issue cannot be decided without determining whether there was a discovery violation. I also differ with the majority's analysis of three other issues—the flight instruction and evidence, evidence of Tamra's drug use on the day she died, and evidence that Kuebler made racial slurs while he was being arrested—but agree that none of these issues require reversal.

**Gunshot Residue Evidence**

¶101. Uniform Rule of Circuit and County Court Practice 9.04(A)(5) requires the prosecution to disclose to the defendant "[a]ny physical evidence . . . relevant to the case." This provision clearly required disclosure of the gunpowder residue kit collected from Tamra. My concern is only with the kit itself, not the test results. This is because the State is *not* required "to test every item of evidence collected" but only to disclose the physical evidence to the defendant (who may then seek to have it tested). *Flaggs v. State*, 999 So. 2d

43

393, 399 (¶18) (Miss. Ct. App. 2008). Thus, Rule 9.04 did not require the State to test the kit. The State did submit the kit for testing but, for reasons that remain unclear, not until the first day of trial. The State concedes that results of the test were exculpatory, triggering a production obligation under *Brady*,[17] which the State fulfilled with respect to the test results. Accordingly, I submit that the remaining issue at this point is whether the State complied with Rule 9.04 with respect to the actual physical evidence—the kit.

¶102. The State denies that a discovery violation occurred (an issue I address below) but alternatively argues that there was no Rule 9.04 violation because that Rule only "contemplates a situation in which the State belatedly attempts to introduce evidence beneficial to its own case; it is out of concern for that situation that the Rule permits a continuance or mistrial unless the State withdraws its attempt to introduce that evidence." *See* URCCC 9.04(I). The State reasons that the Rule has no application here because the test results were exculpatory, and so Kuebler did not object to the admission of the evidence. This argument is a fair reading of paragraph (I) in isolation, but I am reluctant to interpret one part of the Rule to preclude a remedy for a clear violation of another part, i.e., Rule 9.04(A)(5). The recognized purpose of Rule 9.04 "is to avoid ambush or unfair surprise to either party at trial." *Densmore v. State*, 27 So. 3d 379, 382 (¶11) (Miss. 2009). If the State violates Rule 9.04(A) in a way that actually ambushes or unfairly surprises the defendant at trial, a continuance or mistrial should be granted.

¶103. My review of the record in this case leads me to conclude that the defense was

---

[17] *Brady v. Maryland*, 373 U.S. 83 (1963).

surprised at trial by the existence of the kit, as well as the results of the test. By the time this evidence came to defense counsel's attention, they had already cross-examined multiple police officers about their failure (or so the defense thought) to collect a gunpowder residue kit from Tamra's hands, which the defense portrayed as evidence of shoddy police work. None of these witnesses testified that a kit had, in fact, been collected. On appeal, the State argues that the defense was informed on the first day of trial that a test was being conducted. However, defense counsel's questioning of these witnesses belies the State's argument, and I read the district attorney's answers to the trial judge's questions as acknowledging that the test was not mentioned to the defense until the results were obtained on the third day of trial. Finally, while the test results themselves were consistent with Keubler's theory of the case, he was deprived of a meaningful opportunity to pursue further expert analysis that might (or might not) have assisted his defense.

¶104. While I am thus persuaded that Kuebler was surprised at trial, the question remains whether he was "ambush[ed]" by "*unfair* surprise"—i.e., whether there was any discovery violation. *Densmore*, 27 So. 3d at 382 (¶11) (emphasis added). The trial judge did not make findings on this issue, which, as the majority notes, was disputed at trial. A defense investigator testified outside the presence of the jury that he did not believe Tamra's gunpowder residue kit was among the physical evidence disclosed by the prosecution, but on cross-examination, he was equivocal, stating, "I can't say definitely [that it was not], but I do not recall it." The defense also submitted handwritten notes that one of Kuebler's former attorneys purportedly took while reviewing the physical evidence. The notes do not

list Tamra's gunpowder residue kit, but they also do not list Kuebler's gunpowder residue kit, which the investigator thought *was* among the physical evidence he saw, potentially calling into question the completeness of the notes. And the author of the notes did not appear at trial to verify or elaborate on them. In addition, one of Kuebler's trial counsel was present at the meeting with the prosecution, and he argued that the kit had never been disclosed; however, as the State points out, at other times he seemed to be arguing that the State's obligation was more extensive than to simply disclose the existence of the physical evidence. Finally, I note that the State's Rule 9.04 discovery disclosures provided a list of "[t]he physical evidence . . . relevant to this case," but did not list Tamra's gunpowder residue kit. However, for her part, the assistant district attorney was clear, adamant, and consistent that the kit was among the physical evidence disclosed to the defense.

¶105. Thus, there is reason to believe that Kuebler was surprised at trial not because any evidence was missing but only because his attorneys overlooked it.[18] Further, the defendant bears the burden of proving that the State failed to disclose the evidence. *Cf. Havard v. State*, 86 So. 3d 896, 900 (¶12) (Miss. 2012) (*Brady* claim). However, because the trial court did not make necessary findings of fact on that issue, I would exercise our authority to remand the case for that limited purpose. *See* M.R.A.P. 14(b); *Howell v. Bd. of Sup'rs of Jefferson Davis Cnty.*, 70 So. 3d 1148, 1154 (¶18) (Miss. Ct. App. 2011); *Brink v. State*, 888 So. 2d 437, 445 (¶21) (Miss. Ct. App. 2004); *Brown v. Bond*, 811 So. 2d 238, 240-41 (¶¶12-

---

[18] Kuebler's lead trial counsel entered an appearance and apparently began work on the case the week of trial and so was not involved in discovery or the pretrial inspection of the physical evidence.

13) (Miss. Ct. App. 2000).

## Flight Evidence and Instruction

¶106. The trial judge did not abuse his discretion by admitting evidence of "flight" or by giving a jury instruction on the issue.[19] The majority concludes that the evidence should not have been admitted because "Kuebler expressed an independent reason for flight—to avoid returning to the detention center." However, there was no evidence to support the proffered explanation. Kuebler failed to offer any explanation for his flight in his pretrial motion in limine or during the pretrial motions hearing. At the hearing, the assistant district attorney specifically pointed out that Kuebler had "offer[ed] no rational or reasonable explanation for his flight," and Kuebler's attorneys had no response. An explanation was first articulated just prior to trial, when Kuebler's attorneys asserted that after Kuebler was arrested and before he was released on bond, he had been beaten at the Hinds County Detention Center; that while out on bond, he was involved in an auto accident; that "for whatever reason, it was announced to him by [unidentified law enforcement] officers that they were taking him back to jail"; and that Kuebler cut off his ankle monitor and fled to Louisiana because he feared returning to jail. However, there was no proof of this story, which was presented as counsel's "understand[ing]" of the facts or what counsel "believe[d]" to be true. The State responded, "This is the first we've heard about any accident." The only "evidence" that

---

[19] *See Drummer v. State*, 167 So. 3d 1180, 1186 (¶19) (Miss. 2015) (giving a flight instruction is reviewed for abuse of discretion); *Austin v. State*, 784 So. 2d 186, 193 (¶23) (Miss. 2001) (admission of flight evidence is reviewed for abuse of discretion); *Mack v. State*, 650 So. 2d 1289, 1310 (Miss. 1994) (recognizing that the admissibility of flight evidence and the propriety of a flight instruction raise essentially the same question).

47

Kuebler eventually offered consisted of the bare allegations of a civil complaint—which Kuebler voluntarily dismissed before serving the defendants—and a notation in the jail's records that Kuebler was injured in an altercation with police on the night of his arrest—which by itself proved nothing because it was undisputed that Kuebler was in an altercation with police *at the crime scene*. When, even later, the trial judge pointed out that the record still contained "nothing . . . to show . . . that there was an accident," Kuebler's attorneys promised to produce an insurance report or accident report to substantiate the story. No such report was ever produced.

¶107. When the Supreme Court said that "evidence of flight is improper when independent explanations have been offered," *Austin*, 784 So. 2d at 194 (¶25), it surely had in mind explanations with actual evidentiary support, not mere assertions of counsel. In fact, this Court and the Supreme Court have refused to credit explanations that were contradicted or unsupported by the evidence. *See Brown v. State*, 690 So. 2d 276, 294 (Miss. 1996); *Reynolds v. State*, 658 So. 2d 852, 856 (Miss. 1995); *Jackson v. State*, 135 So. 3d 919, 921 (¶¶8-9) (Miss. Ct. App. 2013), *cert. denied*, 136 So. 3d 437 (Miss. 2014); *Jackson v. State*, 28 So. 3d 638, 641-43 (¶¶11-19) (Miss. Ct. App. 2009). Given the complete lack of evidence to support Kuebler's tale, his flight remained "unexplained." *Austin*, 784 So. 2d at 194 (¶24).

¶108. Moreover, the trial judge did not abuse his discretion by finding that Kuebler's decision to cut off his ankle monitor and flee the state while out on bail facing a murder charge was "at least 'somewhat probative.'" *Drummer*, 167 So. 3d at 1189 (¶27) (quoting *Reynolds*, 658 So. 2d at 857); *see also id.* at 1190 n.12 ("Our rules of evidence and caselaw

48

allow evidence of unexplained flight if it is somewhat probative and does not fail the Rule 403 balancing test."). In *Ervin*, which the majority cites (¶31), the Supreme Court "question[ed]" the probative value of evidence that the defendant hid from the arresting officers not simply because the "crime . . . occurred three weeks prior" but also because "the 'escapee' had no knowledge of the crime for which he was being arrested." *Ervin v. State*, 136 So. 3d 1053, 1060 (¶23) (Miss. 2014). Here, in contrast, Kuebler had been indicted and fled the State with full knowledge that he faced life in prison if convicted. I submit that such evidence is "at least somewhat probative" of guilt. *Drummer*, 167 So. 3d at 1189 (¶27), 1190 n.12. Accordingly, I would hold that the trial judge's admission of flight evidence and giving a flight instruction were not errors, harmless or otherwise.

**Evidence of Tamra's Drug Use**

¶109. Although it has been treated as such throughout this case, Tamra's drug use on the day of the murder is not "character evidence" for purposes of Mississippi Rule of Evidence 404(a). "'Character' means a person's innate 'tendency' or 'disposition' or 'propensity' to act or behave in a certain way." Parham Williams, *Williams on Mississippi Evidence* § 4.39, at 4-43 (2013-2014 ed.). Kuebler did not offer evidence that Tamra had a general tendency or propensity to use drugs and, therefore, was likely using and under the influence of drugs at the time of her death; rather, he sought to show that she had in fact been using a variety of drugs and alcohol that entire day, which could have impaired her thinking and contributed to a suicide or accident. That is simply evidence of the actual, same-day events leading up to—and, under Kuebler's theory of the case, contributing to—her death. It is *not* evidence

49

of her general "character . . . for the purpose of proving that [s]he acted in conformity therewith." M.R.E. 404(a).

¶110. *Byrd v. State*, 154 Miss. 742, 123 So. 867 (1929), which the majority cites (¶51), actually illustrates this difference, holding that the defendant in that case, who pled self-defense, was entitled to show *both* that the deceased was "of violent or brawling *character*" *and* was "*at the time* under the influence of intoxicating liquor." *Id.* at 869 (emphasis added). As to the latter, the Court explained that the defendant is entitled "to show all the circumstances under which the fatal difficulty occurred." *Id.* Thus, in *Byrd*, the deceased's generally violent nature was character evidence, but evidence that he was drunk at the time was simply a fact directly relevant to the "fatal difficulty." Here, Kuebler did not seek to introduce "character" evidence that Tamra was habitually under the influence of drugs or alcohol or had a history of suicidal thoughts or tendencies; rather, he sought to introduce only direct evidence that she was under the influence of drugs at the time of the "fatal difficulty."

¶111. If Rule 404(a) were the only basis for excluding this evidence, its exclusion would have been error and likely a violation of Kuebler's due process rights "to present a complete defense" and "to a fair opportunity to defend against the State's accusations." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). However, the trial judge also concluded that absent some other evidence—as opposed to speculation—that drug use actually contributed to Tamra's death, her toxicology report was irrelevant and inadmissible. *See* M.R.E. 401-403. This ruling was not an abuse of discretion, and thus I agree with the majority that the evidence was properly excluded, although not

50

because it was "character evidence."

¶112. It should be noted that if Kuebler had testified, his own testimony regarding Tamra's actions might have been sufficient to establish the relevance of her drug use in the hours leading up to her death. Kuebler had every right to remain silent, but the upshot of his decision not to testify was that he was unable to present the trial judge with competent evidence that Tamra's drug use contributed to her death in any way. *See State v. Mont. Ninth Judicial Dist. Court*, 329 P.3d 603, 606 (¶13) (Mont. 2014) (defendant's right to remain silent does not permit him to "circumvent well-established rules" of evidence or avoid "hard decisions").

**Evidence that Kuebler Used Racial Slurs**

¶113. Lastly, I submit that Kuebler did not sufficiently preserve an objection to testimony that he used racial slurs at the time of his arrest. Kuebler filed a pretrial motion in limine seeking to exclude all evidence that he "was belligerent when taken into custody." No more detail was provided, and at the pretrial motions hearing, Kuebler's attorney actually downplayed the incident: "[H]e was upset, because the police would not come in and try to help the decedent . . . . He was just kind of wild and saying come and help her. . . . He was *not* belligerent at the policemen . . . ." (Emphasis added). There is no indication that the trial judge was provided with any more detail prior to trial regarding the officers' anticipated testimony, and there appears to have been only one contemporaneous objection to the testimony regarding racial slurs, *which the trial judge sustained*. "In order to raise an error on appeal, . . . a contemporaneous objection on *specific grounds* must be made to the

admission of evidence by the trial court." *Denson v. State*, 746 So. 2d 927, 931-32 (¶17) (Miss. Ct. App. 1999) (emphasis added). "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Moffett v. State*, 49 So. 3d 1073, 1088 (¶41) (Miss. 2010) (quoting *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985)). Kuebler's generalized pretrial objection to evidence of his "belligerence" and resistance to arrest—which is at least minimally relevant—was not sufficient to put the trial judge on notice and to preserve an objection to specific testimony that Kuebler used racial slurs. *See Kettle v. State*, 641 So. 2d 746, 748-49 (Miss. 1994) (a pretrial motion in limine must be "specific" to preserve an issue for appeal absent a contemporaneous objection at trial). This is particularly true in this case given that the trial judge actually sustained an early objection to the sort of testimony now at issue.

¶114. I differ with the majority because I conclude that, if there had been a proper objection, it would have been an abuse of discretion to allow the testimony. In *Tate v. State*, 784 So. 2d 208 (Miss. 2001), the Supreme Court held that the trial judge abused his discretion by admitting evidence that the defendant used racial slurs while talking to two deputy sheriffs two to three hours after the alleged assault with which he was charged. *See id.* at 213-15 (¶¶19-29). The Court held that "[t]he probative value, if any, of [the] alleged racial slurs . . . was clearly 'substantially outweighed' by the danger of unfair prejudice." *Id.* at 215 (¶29). While there are factual differences between this case and *Tate*, none changes the basic point that racial slurs uttered to law enforcement officers after an alleged crime are highly prejudicial and generally irrelevant to the question whether the defendant committed the

52

crime. As the majority says (see ¶¶68-69), Kuebler's "resistance to arrest" and refusal to "cooperate" with the police was relevant, which is why I do not take issue with the trial judge's denial, prior to trial, of Kuebler's broad motion in limine to exclude all evidence of his "belligerence." However, I cannot see how the racial slurs that Kuebler directed at the officers are "evidence of consciousness of guilt" (¶69) or how the jury would have been "confuse[d]" by their omission from the officers' testimony (¶68). The admission of this testimony is not error only because there was no contemporaneous objection sufficient to preserve the issue on appeal.

**Conclusion**

¶115. For the reasons discussed above, I would remand the case for the limited purpose of having the trial court make necessary findings of fact regarding whether a discovery violation occurred. Except for this issue and the three others discussed above, I generally concur in the majority's discussion and resolution of Kuebler's other claims on appeal.

**ISHEE, J., JOINS THIS OPINION. CARLTON, J., JOINS THIS OPINION IN PART WITH SEPARATE WRITTEN OPINION.**

**CARLTON, J., JOINING IN PART:**

¶116. I concur in result with the majority opinion to affirm the conviction and sentence imposed by the trial court. I also concur in part with the analysis of the separate opinion of Judge Wilson where he concurs in part regarding the evidence and instruction of flight. Specifically, I concur with Judge Wilson's finding of no abuse of discretion by the trial court in admitting the evidence of Kuebler's flight or by giving the jury instruction on flight.

¶117. While I concur in result with the majority, I also submit that the record fails to show

53

the State suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), or Uniform Rule of Circuit and County Court Practice 9.04(A)(5), with respect to the gunshot-residue kit collected from Tamra. The record reflects that the State provided the defense with open discovery of evidence, including documentary evidence, lab reports, and evidence collected from the crime scene and victim for the defense's due-diligence review and inspection. Tamra's gunshot trace residue collection kit was not new evidence—the record reflects that the gunshot trace residue was collected during Tamra's autopsy on June 30, 2010, the date of Tamra's death. Further, the record shows that the gunshot residue collection kit was then submitted to the lab as submission number 005(a-c) on that same date, June 30, 2010.

¶118. Since the lab received no request from the defense or the State to test the kit, the kit was subsequently returned to the submitting law enforcement agency. *See Davis v. State*, 897 So. 2d 960, 966-67 (¶15) (Miss. 2004). I submit that the defense's failure to request its own testing of evidence collected and submitted to the Mississippi Crime Lab does not render the evidence to be new or suppressed. *See Parker v. State*, 606 So. 2d 1132, 1141 (Miss. 1992) (reversed on other grounds of circumstantial-evidence instruction) (The supreme court found "the State did not withhold the DNA test results . . . from the defendant because they did not exist." Additionally, the supreme court found no suppression of evidence where the State collected DNA in 1988, and the DNA was submitted for testing on September 6, 1989. The State received the results of the DNA testing on October 12, 1989, and informed the defense that it received the results on that same date.).